Willard A. EMERY, d/b/a Southwest Metal Finishing Company, Plaintiff in Error,

v.

A & B COMMERCIAL FINISHING COMPANY, a corporation, Defendant in Error.

No. 37079.

Supreme Court of Oklahoma.

Sept. 24, 1957.

W. E. Green, Raymond G. Feldman, Tulsa, for plaintiff in error.

Wheeler & Wheeler, John M. Wheeler, John Wheeler, Jr., and Robert L. Wheeler, Tulsa, for defendant in error.

BLACKBIRD, Justice.

In the action out of which this appeal arose, defendant in error, as plaintiff, sued plaintiff in error, as defendant, for damages for attempting to injure its business and reputation by enticing away its employees and inducing one of its patrons, Tulsa Testing Laboratory, to breach a contract with it for the painting of certain "hubs" and "spacers." After plaintiff had failed to show it had suffered any damages from the first of these alleged causes, and, both parties had moved for directed verdicts, the trial court sustained plaintiff's motion for such a verdict in the sum of $1,114.67; and a verdict and judgment were entered for it accordingly. As a result, defendant's present appeal from said judgment, without any cross appeal by plaintiff, involves solely the question of whether or not the trial court, by so directing the verdict, correctly determined as a matter of law and undisputed fact, that the defendant had induced Tulsa Testing Laboratory to breach such a contract with plaintiff, and, by reason thereof, was liable to it in damages in the amount of the verdict. Our continued reference to the parties will be by their trial court designations.

According to the undisputed evidence adduced at the trial, the facts forming the background of this controversy are substantially as hereinafter related. Plaintiff, a Tulsa, Oklahoma, corporation, whose president is K. K. Cundiff, is the successor to a company which, for fifteen years prior to 1951, was owned and operated solely by Cundiff under a name identical with that of the plaintiff corporation, without the word "Incorporated" included therein. Its business was sandblasting, metal painting and various chemical treatments of metals. Being desirous of procuring someone capable of assisting in the operation of said business, Cundiff enlisted the aid of the Tulsa Chamber of Commerce in finding such a man. In April, 1951, the Chamber was instrumental in placing him in contact with the defendant, Willard Emery. After discussions between the two, it was decided that the business would be incorporated, that Cundiff would be president thereof, and that Emery would initially invest $3,000 in the business and be employed as its vice-president, with such duties as engineering and installing equipment, and promoting sales.

When Emery first came to Tulsa in 1949 or 1950, he was superintendent of the Western Supply Company, and in that position became acquainted with a Mr. James B. Davis, operator of the Tulsa Testing Laboratory, which, at that time, was doing some work for said supply company. Subsequently, during Emery's second year as vice-president of the plaintiff corporation, Davis contacted him by telephone at his residence, informing him of his Laboratory's need to have painted some hubs and spacers it had contracted to furnish under a federal government contract, and making inquiry as to where he might be able to have such work done. Emery told Davis he could handle the work, that he was then connected with the plaintiff corporation, and asked Davis to make out the order for said work to said corporation. Tulsa Testing Laboratory thereafter forwarded the order to plaintiff on one of its printed "Purchase Order" forms, dated August 12, 1952. The written order set forth no terms of a contract or arrangement between the Laboratory and plaintiff other than typewritten notations showing that it covered "approx. 1000" hubs and "approx. 3000" spacers "To be painted as per instructions." Pursuant to said Order, and at various

times extending over a period of seven or eight months, the Laboratory made available to plaintiff, for painting, hubs and spacers in various sized lots or groups and paid plaintiff for the painting of each lot when it was finished. The price paid for painting the hubs was $6 each. The charge made for painting the first lot of spacers was $2.50 each, but upon changing the process thereafter used, the price was reduced on subsequent lots to $1.75 each. After plaintiff corporation had, in the manner described, completed and been paid for the painting of several lots totalling considerably less than 1,000 hubs and 3,000 spacers, Emery's interest in, and employment by, plaintiff corporation was terminated about the first week of March, 1953. Emery thereupon established his own business in Tulsa under the name of Southwest Metal Finishing Company. Thereafter, the only hubs and spacers plaintiff corporation received from Tulsa Testing Laboratory for painting was one lot that it received in April or May. This lot brought the total furnished for painting under the original Order of August, 1952, to only approximately one-third of the "round", or approximate, figures appearing on the Order. In the meantime, on about April 25, 1953, Emery sent out 400 printed announcements of the opening of his new business, giving its name, location and telephone number. Mr. Davis received one of them. Within a few weeks thereafter, Davis telephoned Emery and inquired as to whether his new establishment would be able to paint hubs and spacers for the Testing Laboratory (as plaintiff company had done) if the Laboratory sent such business to it. Davis was given an affirmative answer; and, thereafter, the Laboratory sent Emery's new company 473 spacers and 325 hubs to paint. The amount of profit he earned in painting these is the same as the amount of the verdict directed for plaintiff against him.

In attempting to demonstrate that the trial court erred in overruling his, and sustaining plaintiff's, motion for a directed verdict, defendant advances three propo-

sitions. Under his Proposition II, he argues that the evidence fails to establish the existence of any complete, valid or enforceable contract between plaintiff and Tulsa Testing Laboratory; and that proof of such a contract is necessary before an action (such as the present one) for procuring its breach will lie. In his Proposition III, defendant urges that, assuming that such a contract existed, the evidence fails to establish he maliciously interfered therewith. We think defendant's contention of error in the trial court's judgment must be sustained on the sole ground asserted in the latter proposition, because, after a thorough examination of the evidence, we think it insufficient to establish that any wrongful act of persuasion, or inducement, on the part of defendant was the proximate cause of plaintiff's claimed injury. In Kelly v. Central Hanover Bank & Trust Co., D.C.S.C.N.Y., 11 F.Supp. 497, 513, it was held that a "noninducing interference or participation" by one, in the contractual relations of others, is not actionable at law as a tort. See also Sweeney v. Smith, C.C., 167 F. 385, 387, 388, and the Annotations at 26 A.L.R.2d 1227, 1249, 1250, and 84 A.L.R. 43, 87, and the Note at 21 L.R.A. 233, 234; 30 Am.Jur., "Interference", sec. 32; 86 C.J.S. "Torts" § 44, note 84, § 57 b at note 57; Restatement Of The Law, Torts, Vol. 4, sec. 766. The proper criterion in cases like the present one is lucidly explained in the following quotation from Augustine v. Trucco, 124 Cal.App.2d 229, 268 P.2d 780, 790:

> "The principles governing an action for unjustifiably inducing a breach of contract are stated in Imperial Ice Co. v. Rossier, supra, 18 Cal.2d at page 36, 112 P.2d at [pages] 631, 633:
>
> "'A person is likewise free to carry on his business, including reduction of prices, advertising, and solicitation in the usual lawful manner although some third party may be induced thereby to breach his contract with a competitor in favor of dealing with the advertiser. * * * A party may not, however, under the guise of competition *actively*

*and affirmatively induce* the breach of a competitor's contract in order to secure an economic advantage over that competitor. The act of inducing the breach must be an intentional one. If \* \* \* his actions *were not intended to induce* a breach he cannot be held liable though an actual breach results from his lawful and proper acts.

\* \* \*

" 'The complaint in the present case alleges that defendants *actively induced* Coker to violate his contract with plaintiffs so that they might sell ice to him. The contract gave to plaintiff the right to sell ice in the stated territory free from the competition of Coker. \* \* \* Had defendants merely sold ice to Coker *without actively inducing him to violate his contract*, his distribution of the ice in the \* \* \* territory \* \* \* would not then have rendered defendants liable. They may carry on their business of selling ice as usual without incurring liability for breaches of contract by their customers. It is necessary to prove that they intentionally and *actively induced* the breach.' " (Emphasis ours.)

Notice also Goodman Bros., Inc., v. Ashton, 211 App.Div. 769, 208 N.Y.S. 83 and Restatement Of The Law, supra, p. 59. In the present case the record reveals no unprivileged or unlawful affirmative act on the part of the defendant to persuade or induce the Tulsa Testing Laboratory, or its operator, Mr. Davis, to terminate its previous arrangement with plaintiff for painting the hubs and spacers. The undisputed evidence shows that Davis took the initiative in placing the controversial 473 spacers and 325 hubs in defendant's hands for that purpose. As far as the record shows, defendant did no more than accept this business, as, in our system of free competition, he had every right to do. In this connection, see National Life & Accident Ins. Co. v. Wallace, 162 Okl. 174, 21 P.2d 492, and the cases therein quoted, together with the comment and cases cited in the note in L.R.A.1915F,

at page 1079. It was in no manner shown that Emery's association with plaintiff corporation, or with Cundiff, was of such nature as to render it wrongful or unconscionable for him, after subsequently setting up his own competitive business, to accept business from any of said company's customers or patrons. It is nowhere contended that in competing for the kind of business in which they were both engaged, either was restricted in competing with the other, any more than strangers would have been. In this connection, notice Elsbach v. Mulligan, 58 Cal.App.2d 354, 136 P.2d 651. When Emery's connection with the plaintiff corporation was severed, there was not only no agreement made with it, or Cundiff, that he would not set up a competing business, but according to Emery's undisputed testimony there was "\* \* \* the understanding that I would probably \* \* \* (do so)." Not only does it appear that Davis initially directed the hub and spacer painting to plaintiff corporation solely because of the connection with it of Emery, under whose supervision he was confident it would be performed according to government specifications, but it is a reasonable inference from Davis' testimony that he would not voluntarily have given said corporation any more of such business after he became aware that Emery was no longer there. (In this connection, see Angle v. Chicago, St. P., M. & O. R. Co., 151 U.S. 1, 14 S.Ct. 240, 38 L.Ed. 55, 62, wherein a similar consideration was rejected on account of the "probabilities" that attended that case.) A careful examination of the testimony renders inescapable the conclusion that it was this confidence in Emery, rather than any active interference by him in the previous arrangement between the Laboratory and the plaintiff corporation, that was the moving, and proximate, cause of Davis' decision, after ascertaining that Emery's new establishment could do such work, to send the 473 spacers and the 325 hubs to it, rather than to the plaintiff, for painting. The fact or probability that Tulsa Testing Laboratory's failure or refusal to give this business to

plaintiff resulted in financial advantage to defendant was insufficient in itself to establish that such conduct was wrongfully induced by him. See Superior Industrial Gas Corporation v. National Cylinder Gas Co., Sup., 64 N.Y.S.2d 244.

In accord with the foregoing, it is our opinion that the evidence in this case, together with all reasonable inferences to be drawn therefrom, fails to establish any actionable wrong on the part of the defendant; and that the trial court erred in refusing to sustain his motion for a directed verdict. Its judgment sustaining such motion of plaintiff is therefore reversed with directions to set it aside and enter a judgment overruling it and sustaining defendant's motion.

CORN, V. C. J., and HALLEY, JOHNSON, WILLIAMS, JACKSON and CARLILE, JJ., concur.

WELCH, C. J., and DAVISON, J., dissent.