KENTUCKY UTILITIES COMPANY

v.

TENNESSEE VALLEY AUTHORITY, Powell Valley Electric Cooperative, Edward J. Hardin, Individually and as Mayor of Tazewell, Tennessee, James B. DeBusk, Individually and as Mayor of New Tazewell, Tennessee.

Civ. A. No. 4861.

United States District Court
E. D. Tennessee, N. D.

Oct. 15, 1964.

Malcolm Y. Marshall, James S. Welch, Ogden, Robertson & Marshall, Louisville, Ky., John A. Rowntree, Claude K. Robertson, Fowler, Rowntree & Fowler, Knoxville, Tenn., James D. Estep, Jr., Tazewell, Tenn., for plaintiff.

William R. Stanifer, Tazewell, Tenn., Philip P. Ardery, Louisville, Ky., Clyde Y. Cridlin, Jonesville, Va., Charles J. McCarthy, Tennessee Valley Authority, Knoxville, Tenn., for defendants.

ROBERT L. TAYLOR, Chief Judge.

Plaintiff, Kentucky Utilities Company, hereafter referred to as KU, seeks injunctive relief against defendants, Tennessee Valley Authority, hereafter referred to as TVA, Powell Valley Electric Cooperative, hereafter referred to as Powell Valley, Edward J. Hardin, Individually and as Mayor of Tazewell, Tennessee, and James B. DeBusk, Individually and as Mayor of New Tazewell, Tennessee, to prevent them from taking or attempting to take its electric customers in the area of Tazewell and New Tazewell, Claiborne County, Tennessee, and also a judgment for damages for loss of business resulting from defendants' alleged wrongful acts.

Jurisdiction is based on 28 U.S.C. §§ 1331, 1332, 2201 and 2202.

The action against Mayors Hardin and DeBusk in their individual capacity was withdrawn during the trial.

KU seeks to enjoin TVA from selling or delivering electric power to Powell Valley, a distributor of TVA power, and enjoin Powell Valley from purchasing or receiving from TVA electric power for resale in either of the municipalities of Tazewell, Tennessee or New Tazewell, Tennessee, other than to customers and locations receiving electric service from Powell Valley on October 30, 1963. Relief is also sought against the Mayors of the two towns in their official capacities to prevent them from interfering with KU customer contracts.

Plaintiff contends that commencing in 1961 or 1962 and continuing to the present time, all of the defendants have com-

bined and conspired and acted together to appropriate to themselves all of the electric utility customers, business, revenues and contracts of KU for electric service within the two Tazewells, and that several dozen customers have been lost by KU as a result of the conspiracy.

The claimed overt acts consist of numerous meetings held by the representatives of defendants whereby plans were devised and carried out through acts commencing October 30, 1963 to take all of the business of KU in the two municipalities.

Plaintiff further contends that the TVA in furnishing electric power and in agreeing to furnish electric power to Powell Valley, which sells to the two municipalities and which has agreed to sell at retail to customers located in the corporate limits of the municipalities, violated 16 U.S.C. § 831n-4 (hereafter called the 1959 TVA Act), which provides in pertinent part as follows:

" * * * Unless otherwise specifically authorized by Act of Congress the Corporation shall make no contracts for the sale or delivery of power which would have the effect of making the Corporation or its distributors, directly or indirectly, a source of power supply outside the area for which the Corporation or its distributors were the primary source of power supply on July 1, 1957, and such additional area extending not more than five miles around the periphery of such area as may be necessary to care for the growth of the Corporation and its distributors within said area: Provided, however, That such additional area shall not in any event increase by more than 2½ per centum (or two thousand square miles, whichever is the lesser) the area for which the Corporation and its distributors were the primary source of power supply on July 1, 1957: And provided further, That no part of such additional area may be in a State not now served by the Corporation or its distributors or in a municipality receiving electric service from another source on or after July 1, 1957, and no more than five hundred square miles of such additional area may be in any one State now served by the Corporation or its distributors.

"Nothing in this subsection shall prevent the Corporation or its distributors from supplying electric power to any customer within any area in which the Corporation or its distributors had generally established electric service on July 1, 1957, and to which electric service was not being supplied from any other source on the effective date of this Act."

- The Act became effective August 6, 1959. It is to be noted that thereunder the TVA, except for specified exceptions, was not to contract for the supply of power "outside the area for which the Corporation or its distributors were the primary source of power supply on July 1, 1957."

KU insists that TVA was not the primary source of power supply in the areas of the two municipalities on July 1, 1957 within the meaning of the Act but that the municipalities were receiving electric service from KU on that date and on the date the Act became effective.

KU further contends that there was a common law conspiracy of the defendants to interfere with the contractual relations between it and its customers in the two municipalities by inducing such customers to terminate their contracts with KU in violation of the 1959 TVA Act.

TVA contends that plaintiff has no standing to maintain the action as the complaint presents no justiciable controversy. That KU does not have an exclusive franchise to furnish electric service in the municipalities and has no common law or statutory right to be free from competition of TVA and its distributors. That the 1959 TVA Act does not expressly confer upon KU the right to maintain an action based upon alleged violations of the Act by TVA and, in

the absence of such provision KU is without standing to bring the action.

TVA contends further that the findings of its Board that the two municipalities are within the TVA service area is not subject to judicial review if the finding was made in good faith and supported by substantial evidence and that the Board's action met these requirements.

TVA also contends that it has made no contract since the effective date of the Act which would have the effect of changing the relationship of TVA or its distributors with respect to the source of power supply in the two municipalities.

TVA says that it and its distributors were the primary source of power supply in the two Tazewells on July 1, 1957 within the meaning of the 1959 TVA Act.

TVA denies that it unlawfully induced or combined to induce customers of KU to terminate, breach or sever alleged contracts with KU for electric service.

TVA asserts that the citizens of Tazewell and New Tazewell, Tennessee have a right to obtain electric service from whomever they please and that KU has no right to be free from lawful competition.

The two Mayors, and the municipalities which they represent, adopted the contentions made by TVA and in addition they contend that KU is serving customers in the area of the municipalities at the sufferance of the municipalities as KU has neither an exclusive franchise nor any franchise to serve the municipalities. They assert that the municipalities have the right under the Tennessee law to establish their own electric systems and that the citizens acting through their elected officers have the right to choose between the TVA current and the current furnished by private institutions.

The defenses of Powell Valley to the complaint are the same as the other defendants insofar as applicable.

*Standing of Plaintiff to Maintain Action*

If plaintiff has proved the charges of common law conspiracy and a violation of the 1959 TVA Act and has sustained injuries therefrom, it has standing to maintain the suit. National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537, cert. denied, 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69 (C.A. 6); Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., (Cir.), 116 U.S.App.D.C. 285, 323 F.2d 290, cert. granted, 376 U.S. 948, 84 S.Ct. 967, 11 L.Ed.2d 969; Commercial State Bank of Roseville v. Gidney, D.C., 174 F.Supp. 770, affirmed, 108 U.S.App.D.C. 37, 278 F.2d 871.

The cases cited by TVA of Alabama Power Company v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374, Tennessee Electric Power Company v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 and Kansas City Power & Light Company v. McKay, 96 U.S.App. D.C. 273, 225 F.2d 924 are distinguishable from the case under consideration. Each of these cases involved a suit by a private utility to enjoin officers or agencies of the United States from making contracts which would have the effect of increasing competition between the private retailer and the public power agencies. The public power agencies' competition was legal in itself, but was attacked on the basis that either the statutes authorizing the activities of the various officers and agencies were unconstitutional or that the officers and agencies had exceeded their authority under the Act. In each case, it was held that the competition complained of was in itself not prohibited by statute or the terms of an exclusive franchise; hence, no common law or statutory rights of the plaintiffs had been invaded. The plaintiffs, therefore, had no standing to question the authority of the various officers and agencies of the United States.

In Alabama Power Company v. Ickes, supra, the Court likened the position of the plaintiffs to that of a taxpayer suing to enjoin the expenditures of federal funds, which could not be done under the decision of Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078. The distinction

in these cases is that the competition was shown to be legal while in the case under consideration it is claimed that the competition is illegal by reason of the unlawful conspiracy and the alleged violation of the 1959 TVA Act. See: Texas & P. R. Co. v. Rigsby, 241 U.S. 33, 39–40, 36 S.Ct. 482, 60 L.Ed. 874; Wheeldin v. Wheeler, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605; Hooper v. Mountain States Securities Corporation, 282 F.2d 195, cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693, and Dann v. Studebaker-Packard Corporation, (C.A. 6) 288 F.2d 201.

### Findings of TVA Board Subject to Judicial Review

The TVA Board on August 26, 1964, some three weeks before the trial, found and determined that all of Claiborne County, Tennessee (within which County the two municipalities are located) is within the area for which TVA or its distributors were the primary source of power supply on July 1, 1957.

The TVA was first contacted by the Claiborne County Chamber of Commerce in 1961 for power. One or more members of the TVA legal staff was present at this meeting. The representatives were advised by TVA that there was a legal question as to whether TVA power could be supplied in the municipalities under the 1959 TVA Act and that a court decision would be helpful in resolving the question. Mr. Wessenauer testified in a discovery deposition that the TVA lawyers had advised him that under the Act TVA power could be supplied in Tazewell and New Tazewell and that so far as he was concerned that was the end of it. He also testified that the TVA left it up to the distributors to determine that they were staying within the boundaries set by the 1959 Act and that he thought this was a factor that should be taken into consideration by the TVA Board in determining the TVA area. He stated that if he were fixing the lines he would wipe out the pockets inside the TVA service area. That he had not been advised as to the provisions of the Act with respect to "islands."

The factual presentation of Mr. Wessenauer, supplemented by the opinion of Mr. McCarthy, Chief Counsel, and its independent study, caused the Board to conclude that the two towns were within the TVA service area on July 1, 1957.

The issue before the Board was one of fact and law. Proper interpretation of the 1959 Act was the law issue, and the determination of the area supplied by TVA and the area supplied by other sources was the issue of fact.

■ It is the duty of the Court to construe the Act and to determine whether TVA acted within its authority under the Act. Stark v. Wickard, 321 U.S. 288, 309–310, 64 S.Ct. 559, 88 L.Ed. 733; National Bank of Detroit v. Wayne Oakland Bank, supra; Civil Aeronautics Board v. Delta Air Lines, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869.

The case of Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108, cited by the defendants involved the Walsh-Healy Act which expressly provided for hearings to be held by the Secretary of Labor at which evidence would be introduced and on the basis of that evidence a wage determination would be made. The question of the size of "localities" was necessarily one of the subjects upon which the Secretary was required to act in each case and make a determination. The decision by the Secretary was a decision of Congress made by delegated authority.

Another case cited, Re United States ex rel. TVA v. Welch, 327 U.S. 546, 554, 66 S.Ct. 715, 90 L.Ed. 843, is distinguishable from the present case in that the discretionary power to determine what lands should be condemned is expressly provided by the TVA Act. Title 16 U.S.C. § 831x.

United States v. Carmack, 329 U.S. 230, 242–243, 67 S.Ct. 252, 91 L.Ed. 209, involved the selection of sites to be condemned for post offices. The Court noted that within its legislative power, Congress had the right to choose or reject the proposed post office site by direct action.

## Conspiracy Charge

In support of its charge of conspiracy, KU contends that when the question of TVA power for the two municipalities was considered in 1961, TVA doubted that its power could be distributed in the municipalities without violating the 1959 Act and that a court decision should be obtained to clarify the issue. It was made clear by representatives of TVA and Powell Valley at this meeting that Tazewell and New Tazewell could not feasibly establish an electric system of their own but would have to depend on Powell Valley.

After the initial consideration of this question, KU contends that TVA officials cooperated in a move by the Chamber of Commerce and the two municipalities to buy TVA power for Tazewell and New Tazewell without getting a court construction of the Act. From that point on, various problems, in addition to the territorial limitations contained in the 1959 Act, were encountered.

KU asserts that it was known that KU would not voluntarily sell its facilities in the area of the municipalities and that the defendants planned to use various forms of threats and duress upon KU to force the sale of its facilities. That it was planned to use the Tennessee Public Service Commission as a lever to force the reduction of KU's rates in the area and to use threats to duplicate the KU system by a parallel system.

It further contended that Powell Valley was known to be the only feasible agency to supply TVA power in the two Tazewells from an economic standpoint but was blocked from doing this for several reasons: First, there was an agreement between Powell Valley and KU as to the boundaries to be served by these utilities. The 1959 Act encouraged such agreements. After several meetings of the defendants in 1961 and 1962, Powell Valley gave notice of termination of the 1958 agreement between it and KU to be effective in 1963. The 1952 agreement between KU and Powell Valley which prevented the taking of each other's cus-tomers could not be terminated according to its terms without terminating the whole tri-party agreement under which KU supplied power into the Tazewell and New Tazewell area for its own customers and also for use by Powell Valley. This was an advantageous arrangement to Powell Valley and termination was not desired.

KU asserted that REA had a policy against duplicating facilities and the use of funds of the cooperative borrower for the construction of duplicating facilities.

That Powell Valley feared that if KU was pushed out of the Tazewell and New Tazewell area, KU itself might terminate the 1952 tri-party agreement under which KU supplied power to TVA for use by Powell Valley. If this should happen, Powell Valley customers in the area would be left without a source of TVA power. TVA put to rest this fear when the TVA Board promised that some source of power would be supplied if the parties moved along with the plan and supplanted KU in the area.

That because of many problems, a decision was made by defendants to use a so-called municipal system initially to displace KU in Tazewell and New Tazewell and the surrounding area. It was recognized that a municipal system was not feasible but that it might be utilized as an initial arrangement to displace KU, after which Powell Valley would take over. Powell Valley service lines were to be used in getting its service to this small initial municipal system. While the two cities were carrying on the so-called municipal system, Powell Valley would actually do the operating, meter reading, and servicing.

It was KU's contention that TVA and Powell Valley suggested that the Mayors of the two cities present resolutions under which the Board of Aldermen of the cities simply turned the whole matter of establishing and operating this system or systems over to the Mayors to handle as the course of expediency dictated.

That in October, 1963, Powell Valley's contractor and engineer, acting under os-

'tensible contracts with the Mayors, moved in and started disconnecting KU's customers who were induced by the foregoing arrangement to switch, and connected them to Powell Valley's lines. The municipal system that was thus constructed consisted largely of drop service lines to individual customers, which lines were connected to the nearest lines of Powell Valley. In several instances, one or more poles and a transformer were required to connect the customer to Powell Valley lines. After twenty-four customers of KU were appropriated, this action was instituted and the further taking of customers ceased. The contractor discontinued his work for the municipalities.

█ In the Court's opinion the evidence fails to show a conspiracy upon the part of any of the defendants. The evidence shows that the retail rates for electricity to residential and commercial customers in effect for KU prior to the institution of this suit were substantially higher than those for the TVA power distributors, and under applicable rate schedules the disparity increased with increased use. As a consequence, some of the witnesses testified that within the two towns the value of properties served by TVA electricity was substantially and uniformly higher than similar properties served by KU. The rate disparity created discontentment among some of the residential and industrial consumers and a number of citizens of the two towns appealed to their civic leaders and to their elected officials to explore the possibility of lower cost electricity. Numerous meetings were held among representatives of the municipalities, Powell Valley, TVA and various civic groups to see what could be done towards getting TVA power beginning in 1960. At these meetings, TVA representatives advised that TVA could not enter into a power contract with either of the municipalities because they were so small that it would not be economically feasible for them to build and maintain their own separate distribution system and undertake the responsibilities of a TVA distributor. The representatives of the towns were advised to discuss their problems with Powell Valley to see if suitable arrangements could be made to obtain their electricity from Powell Valley.

Powell Valley advised the municipalities that it would be unable to obtain REA financing for construction of duplicating distribution lines within the towns and, therefore, the towns would have to buy or build their own systems.

At a meeting with the TVA Board of Directors, on February 4, 1960, the Board advised representatives of Middlesboro, Kentucky and Tazewell, Tennessee, that both Tazewell and New Tazewell were within the area for which TVA was the primary source of power supply on July 1, 1957. At a meeting on November 27, 1962, TVA gave representatives of the towns and Powell Valley assurance that TVA would continue to supply Powell Valley with the power necessary to meet its loads in the Tazewell and New Tazewell area.

The municipalities then sought technical assistance and advice from the Legal Consultant on Municipal Law at the University of Tennessee as to how they might go about financing their own municipal electric systems. They employed an attorney who specialized in this field to advise and consult with them. After considering the advice and suggestions given them, the two towns, through their authorized officials, circulated a petition to the citizens of the towns to determine their desires in this matter. These petitions showed a strong sentiment for the acquisition by the towns of their own municipal electric systems. Following the circulation of these petitions, the town councils passed resolutions on October 21, 1963 authorizing the Mayors of the two towns to take the necessary steps to purchase or build their own municipal systems and to finance the same from revenues to be derived from the systems. They expressed to KU their desire to purchase KU's distribution system in the two towns, but KU did not respond and they decided

to build their own systems. They engaged a contractor to build the necessary facilities and to make the connections to the new customers. Thereafter, the two towns arranged with Powell Valley to maintain and operate the systems, do any additional construction work, make electrical connections, and handle the billing of the customers in the name of the two towns. Powell Valley was to sell electricity to the two towns at wholesale rates plus a small charge for transmitting the electricity, and it was also agreed that the rates charged the city customers would be no higher than those charged by Powell Valley to its customers under its contract with TVA.

Beginning in October, 1963, a number of residents of the two towns who were then receiving service from KU made application to the towns for electric service and notified KU to discontinue service to them and to disconnect their meters. On October 31, 1963, until the filing of this suit on November 7, 1963, eighteen former customers of KU had terminated their service with KU and became customers of the two towns.

The towns of Tazewell and New Tazewell have a legal right to own and maintain their own municipal electric systems and have a right to compete with KU for the customers in those towns and the offering to serve those customers at lower rates than those charged by KU did not constitute an unlawful interference with the customer contracts of Ku in the absence of fraud. The evidence fails to show any fraud upon the part of any of the defendants. 86 C. J.S. Torts § 44c, (1954); Annot., 84 A.L.R. 63 (1933); Annot., 26 A.L.R.2d 1259 (1952); Fairbanks, Morse & Co. v. Texas Electric Service Co., 63 F.2d 702 (C.A.5, 1933); Citizens' Light, Heat & Power Co. v. Montgomery Light & W. P. Co., 171 F. 553 (M.D.Ala.1909); Wolf v. Perry, 65 N.M. 457, 339 P.2d 679 (1959); Emery v. A. & B. Commercial Finishing Co., 315 P.2d 950 (Okl.1957); Augustine v. Trucco, 124 Cal.App.2d 229, 268 P.2d 780 (1954).

The consumers in Tazewell and New Tazewell who have discontinued their service with KU had a legal right to discontinue such service and to take service from the municipalities. Cass County Electric Coop. v. Otter Tail Power Co., 93 N.W.2d 47 (N.D.1958); Blue Ridge Elec. Membership Corp. v. Duke Power Co., 258 N.C. 278, 128 S.E.2d 405 (1962).

### Was TVA the Primary Source of Electric Power In Tazewell and New Tazewell on July 1, 1957?

KU contends that the area for which TVA or its distributors were the primary source of power supply on July 1, 1957 is the actual geographical area where the distribution facilities and customers of TVA and its distributors were located on that date; that if other utilities were the actual source of power, such areas were excluded from the TVA areas although they may have been wholly or partially surrounded by areas for which TVA or its distributors were the actual source.

KU argues that if a perimeter is to be drawn defining primary service area, the location of such perimeter can be properly fixed only by such facts as the facilities, customers and the rendering of service. Where adjacent service areas of private utilities form peninsulas or corridors or other indentations into the service area of TVA, such perimeter must follow these factual service areas and thereby exclude such peninsulas or corridors from the primary service area of TVA.

Ku insists that all of the maps filed in evidence show that TVA or its distributors were not the primary source of power in these municipalities on July 1, 1957, and that a dozen TVA maps in evidence draw the continuous perimeter of TVA's primary service area so as to dip down into Claiborne County south of Tazewell and exclude, from TVA's area, KU's service area extending down from KU's adjoining service area in Kentucky. Thus, it argues, TVA's primary service area does not include, and cannot law-

fully be described so as to include these peninsulas of established service of adjacent private utilities.

KU has insisted that on July 1, 1957 there were in excess of 70 municipalities served by private power companies, which were entirely surrounded by TVA service and that these islands or pockets of private power service were referred to in the legislative history of the 1959 Act. KU contends that it is inconceivable that anyone could conclude that TVA was the primary source of power supply within these municipalities on July 1, 1957 or that these municipalities could be considered in the area for which TVA was the primary source of power supply on such date.

TVA asserts that these 70 municipalities which plaintiff refers to as being within the primary area are mostly small unincorporated communities which are not municipalities at all. 62 C.J.S. Municipal Corporations § 1d (1949).

KU points out that the fact that TVA's distributor, Powell Valley, on July 1, 1957 supplied 16 customers in KU's defined service corridor in Claiborne County outside of Tazewell and New Tazewell, and 28 customers within the towns, does not affect the conclusion that KU was the primary source of power supply in the defined corridor including the two towns. That Congress recognized that there might be areas where TVA distributors supplied some customers but were not the primary source of power supply. Such areas, it argues, including the KU corridor and the two towns, therefore, are not part of the area for which TVA or its distributors were the primary source of power supply on July 1, 1957.

The territorial provisions of the 1959 Act deal with three areas: First, the area of primary service of TVA which consists of approximately 80,000 square miles shown on the large map filed as Exhibit 96, and which, the evidence shows, was used by TVA representatives when they appeared before the Committees of Congress which had the bill under consideration. Second, the additional five mile strip around the periphery of the primary service area. Third, the other areas lying outside the primary area where TVA or its distributors had generally established electric service on July 1, 1957.

The statute provides in part:

" * * * the Corporation shall make no contracts * * * making the Corporation or its distributors * * * a source of power supply outside the area for which the Corporation or its distributors were the *primary source of power* supply on July 1, 1957, and such additional area extending not more than five miles around the periphery of such area * * * " (Emphasis added.)

and that

"Nothing in this subsection shall prevent the Corporation or its distributors from supplying electric power to any customer within any area in which the Corporation or its distributors had *generally established electric service on July 1, 1957, and to which electric service was not being supplied from any other source on the effective date of this Act.*" (Emphasis added.)

■ The Court had grave doubt during the trial as to whether the last quoted paragraph referred to the primary area, but is now convinced that *it refers to the area in which TVA had established electric service outside of the 80,000 square mile primary area and the additional five mile strip.*

The words "Nothing in this subsection shall prevent" appears to be an additional *grant of power to serve an area not covered by the preceding paragraph relating* to the primary area and the five mile strip, rather than a limitation on the power to serve the primary area.

■ If the statutory language is clear, it may be given effect in accordance with its provisions without resort to legislative history. Caminetti v. United States, 242 U.S. 470, 485, 37 S. Ct. 192, 61 L.Ed. 442; Osaka Shosen Kaisha Line v. United States, 300 U.S.

98, 57 S.Ct. 356, 81 L.Ed. 532; United States v. State of Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575. But the legislative history supports what we believe to be a logical reading of the language of the Act.

We are told in the briefs that the Senate passed a bill in 1957 which would have permitted TVA to serve the whole of any county lying partly within TVA's existing service area or the Tennessee watershed, which would have permitted an increase in the area served by TVA from 80,000 to 105,000 square miles. That the bill passed by the House in 1959 would have limited TVA to its existing service area. That the task before the Senate in 1959 was to work out a compromise between these two proposals.

The report of the Senate Committee rejected the term "service area" because it was "nebulous" and because some of the members felt that it would prevent TVA distributors from serving "small areas served by private power entirely surrounded by the lines of TVA distributors" and "areas in which the lines of distributors of TVA power and the

lines of private power companies are interlaced." [1]

Senator Randolph expressed the view that TVA should be encouraged to serve any islands that existed within its geographical operating area as it existed on July 1, 1957. [2]

Senator Randolph and Senator Talmadge sponsored the territorial amendment which was adopted on the Senate floor. If Senator Randolph believed that TVA should be encouraged to serve islands of private power company service within its operating area, it is not likely that he would have sponsored an amendment whose language prevented TVA from rendering service within the primary area.

Senator Cooper objected to the provisions of the Randolph-Talmadge amendment prohibiting service in a municipality outside its primary area of service as he felt that small municipalities near the periphery should be allowed to obtain TVA power. He apparently had no question about its authority under the amendment to serve municipalities inside the periphery. [3]

1. "Under the original TVA Act, Congress provided that the area in which TVA power should be made available would be determined, first by the desire of the people, and second by the economic and engineering feasibility of providing service. The term 'service area' is a nebulous one and difficult to define. TVA now has no service area as such. TVA delivers power to points, thus the service area of TVA is the service area of its customers. Although there has been no statutory boundary established, there has been no material increase for about 15 years in the area supplied by power from TVA. It was generally agreed by many that the working arrangement that now exists with respect to this area was satisfactory and no area limitation was required. Others believed, however, that the stabilization area should be defined and limited by law.

 *     *     *     *     *

"* * * The area where each distributor sells power is determined by community growth and the relationship between neighboring distributors. Within the general area receiving TVA pow-

er there are small areas served by private power entirely surrounded by the lines of TVA distributors. There are also many areas in which the lines of distributors of TVA power and the lines of private power companies are interlaced.

"The committee was of the opinion that the language of the House bill would invite litigation any time that a distributor of TVA power undertook service to a new customer, even within the general area it was already serving. Even if such litigation were eventually resolved in an equitable manner, its existence could raise serious problems in the marketing of the bonds of TVA." [From Report of Senate Committee, H.R. 3460, Report No. 470, pp. 8, 9].

2. "Of course, consistent with this view TVA should be encouraged to serve any 'islands' which now exist within its geographical operating area as it existed on July 1, 1957." [Supplemental views of Mr. Jennings Randolph on H.R. 3460, p. 56].

3. "Further, the right of choice of small communities which are near the periphery

Representative Davis, the House floor manager for the bill, when explaining the effect of the Senate version stated that the Senate bill drew a line around the periphery of the area for which TVA and its distributors were the primary source of power supply on July 1, 1957.[4]

Statements of sponsors of the bill rather than opponents are usually looked to for legislative history. Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 395, 71 S.Ct. 745, 95 L.Ed. 1035; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 474–475, 41 S.Ct. 172, 65 L.Ed. 349.

Representative Vinson, an opponent of the bill, felt that the territorial limitations in the Senate bill were more generous to TVA than that of the House

bill, but he felt that the limitations in the Senate bill could be justified.[5] He recognized that TVA would have full authority to supply the full power requirements of the primary area.

Representative Scherer, an opponent of the bill, understood that TVA could serve areas already receiving power from another source.[6]

The maps filed as exhibits in this record, Exhibits 94, 95 and 96, and used by TVA witnesses before the Congressional Committee, show that Claiborne County was within TVA's primary service area. One of the maps was presented by KU (Ex. 92) which showed all of Claiborne County in the primary area except a small mountainous part. However, KU filed another map, Exhibit 100,

of TVA ought to be considered. We are not concerned solely by the interests of TVA and private utilities. The small, self-governing communities in the TVA area should have the right to make a choice of whether they will receive power from the Tennessee Valley Authority or from a private utility." [105 Cong. Rec. 13052].

\* \* \* \* \*

"I am very sorry the Senate has seen fit further to circumscribe the TVA area beyond the committee amendment, and in effect give to the private utilities outside it what I consider to be a monopoly as far as rates outside or near the area are concerned.

"Nevertheless, if my motion to strike shall be defeated, I will vote on final passage for the bill, because I have sponsored self-financing from the outside. I respect the service of private utilities in my own State. I have stood for the right of the people in small communities and cooperatives near the TVA area to have some voice in their choice of power supply." [105 Cong.Rec. 13053].

4. "As a substitute the Senate bill, in effect, draws a line around the periphery of the area for which either TVA or its distributors were the primary source of power supply on July 1, 1957. It permits additional service within that area." [105 Cong.Rec. 14114 (1959)].

5. "While the territorial limitation by the Senate is more generous to TVA than that of the House, I believe it can be justified. I think, therefore, it is safe to say that this amendment proposed

and adopted by the other body, if adopted by the House and enacted into law, will provide a fair and reasonable limitation under which TVA will be allowed to increase its power generating capacity to meet the increased requirements within the area delineated by the amendment, and at the same time give reasonable protection to the privately owned systems, and their investors, and to the municipalities and other governmental organizations dependent upon the privately owned systems as an indispensable source of tax revenue." [105 Cong.Rec. 14122 (1959)]

6. "However, the total area of such 5-mile extension beyond the present periphery greatly exceeds the 2½ percent or 2,000 square mile limitation provided by the Senate bill. Therefore, TVA during the next few years can pick and choose as it sees fit in this 5-mile extended area such spots as it desires until the 2½ percent or 2,000 square miles have been reached.

"One can readily see that in some places the present periphery will not be extended at all. In other places it may be extended 1 mile beyond the present periphery; in other places, 2 miles or 3 or 4 miles. TVA will pick and choose the best and most lucrative spots in this 5-mile area whenever it gets around to it. In the meantime, private power companies certainly will hesitate to extend their service to anyone within the 5-mile area because there will be no assurance that TVA might not the next day decide to take over that particular area." [105 Cong.Rec. 14125 (1959)]

which shows that the Tazewells were served by KU. This map also shows facilities of KU, including transmission lines that run from Bell County, Kentucky, southeast through the two Tazewells. KU referred to this location throughout the trial as a corridor or peninsula served by it. Maps show that the lines of Powell Valley crossed the lines of KU at one point in the so-called corridor. Some maps also show that the lines used to serve Powell Valley customers surround the towns. The TVA prepared maps over a period of years which showed that KU served Tazewell and New Tazewell.

As of July 1, 1957, Powell Valley and the City of LaFollette Electric System (the other TVA supplier for Claiborne County) supplied power to a total of 3,564 consumers in Claiborne County and KU supplied power to 1,839 consumers. In June, 1957 Powell Valley and LaFollette had combined kilowatt-hour sales of 1,025,793 as against 626,043 kilowatt-hours for KU. In the same month, the combined kilowatt demand for Powell Valley and LaFollette was 3,125 kilowatts as against 2,338 for KU. The depreciated plant investment in distribution facilities of Powell Valley and LaFollette (as of January 10, 1957 for Powell Valley and as of June 30, 1957 for LaFollette) was $902,999.17 as against KU investment on June 30, 1957 of $457,-947.93.

On July 1, 1957, in Tazewell, KU supplied the electric energy requirements of 344 customers and Powell Valley supplied the requirements of 20 customers, and in New Tazewell KU supplied 217 customers and Powell Valley supplied 8 customers. Considering the two municipalities together, KU had a total of 561 customers and Powell Valley 28 customers. KU on such date served in these two municipalities 95.3% of the customers receiving electric service.

During the month of June, 1957, in Tazewell, KU supplied 118,737 KWH of electricity while Powell Valley supplied 11,368 KWH, and in New Tazewell KU supplied 116,645 KWH compared to 3,024

KWH supplied by Powell Valley. Considering the two towns together, KU supplied a total of 235,382 KWH to Powell Valley's 14,392 KWH. KU thus supplied 94.2% of the KWH of electricity consumed in these two towns during June, 1957. During the month of July, 1957, in Tazewell KU supplied 106,647 KWH to Powell Valley's 11,410, and in New Tazewell KU supplied 121,440 KWH to Powell Valley's 3,356. In the two towns, KU thus supplied 228,087 KWH during this month to Powell Valley's 14,766 KWH. In July 1957 KU thus supplied 93.9% of the electric energy consumed in the two towns.

On August 6, 1959, the day the Act became effective, KU in Tazewell supplied 371 customers to Powell Valley's 19 and in New Tazewell KU supplied 256 customers to Powell Valley's 12. In the two towns combined, KU supplied a total of 627 customers to Powell Valley's 31.

As of July 1, 1957, KU supplied electric energy to 1,278 customers outside of the municipalities. In 1963, a 34.5 KV transmission line of KU was rebuilt to a 69 KV which is now owned, maintained and operated by KU within this corridor of KU's service area.

On October 30, 1963, the customers of TVA suppliers had increased to over 100 in the municipalities.

The town of Tazewell was incorporated on November 17, 1954 and the town of New Tazewell was incorporated on November 19, 1954. KU and its predecessors had been serving the incorporated areas at least as early as 1920.

In 1952, prior to the enactment of the TVA Act of 1959, KU, TVA and Powell Valley entered into an agreement with respect to means of supplying the loads of KU and Powell Valley. Powell Valley had been serving Claiborne County since 1940. KU and Powell Valley by letter agreement on January 8, 1958, agreed that neither party would serve any customer at any given location, which location was taking service from the other party; that any new load would be served by the party whose facilities were

closest to the load and that the parties would consult with each other in an honest effort to resolve any differences on an equitable basis. The letter agreement provided it should remain in effect for a period of five years and should continue from year to year subject to the right of either party to terminate at the end of any annual extension.

Maps were prepared defining the respective areas. For a number of years, the maps were used to resolve questions which arose as to service to particular customers. This agreement was terminated by Powell Valley some time in 1962 or 1963.

The TVA Board of Directors on August 26, 1964 made an official and formal finding to the effect that all of Claiborne County, including the towns of Tazewell and New Tazewell was within the periphery of the area for which TVA or its distributors were the primary source of power supply on July 1, 1957. At the time of the determination, the Directors had before them the four maps that were submitted to the Committees of Congress by the witnesses for TVA.

The area within Claiborne County determined by the TVA Board to be within the area for which TVA or its distributors were the primary source of power supply in July 1, 1957 is identical to the areas shown as served by the TVA distributors on the maps furnished by TVA to the Congressional Subcommittee.

The finding of the Board was made in good faith and supported by substantial evidence.

The history of the 1959 Act supports the finding of the TVA Board that Tazewell and New Tazewell were within the primary area served by TVA and its suppliers as of July 1, 1957. We do not believe that Congress in the 1959 Act intended to exclude the two Tazewells from the primary service area served by TVA and its suppliers as of July 1, 1957. United States v. Burleson, D.C., 127 F. Supp. 400.

None of the defendants has induced or conspired to induce any electric customer of KU to breach his or its contract with KU and none has been guilty of bad faith, fraud or deceit in the securing of electric power customers within the two municipalities.

It results that the proof fails to show that plaintiff is entitled to any of the relief sought in the complaint.