## SNYDER v. NATIONAL UNION INDEMNITY CO.*
### No. 767.

Circuit Court of Appeals, Tenth Circuit.
June 26, 1933.

*Rehearing denied August 22, 1933.

Harry Goldberg and Kneland C. Tanner, both of Salt Lake City, Utah, for appellant.

Hamilton Gardner and H. A. Rich, both of Salt Lake City, Utah, for appellee.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

LEWIS, Circuit Judge.

Glenn Snyder, an infant appearing by his father as guardian ad litem, recovered a default judgment in the district court of the state of Utah against Perry A. Day on December 11, 1931, for $5,400 on account of permanent injuries which he received while riding in an automobile truck. The truck belonged to Sam Holland, and Day was em-.

ployed by him to operate it. On the occasion of the injury, Day at the direction of Holland was transporting a load of salt from Salt Lake City, Utah, to Cedar City, Utah, and without Holland's permission or knowledge Day let Glenn Synder, another child, Gerald Findlay, and Glenn's mother accompany him on the truck. Day told Holland that La Vare Snyder, the father, was going with him. Glenn Snyder and the Findlay child were nephews of Day's wife. Each child was under five years old. Day was not driving the truck at the time of the accident. At his request it was then being driven by La Vare Snyder, and in passing another truck going in the same direction Snyder so managed the truck that it struck the end of a culvert when going at a speed of approximately 40 miles per hour, turned over, killed the Findlay child, and permanently injured Glenn Snyder.

After obtaining the judgment in the state court, Glenn Snyder, by his father as guardian ad litem, brought this suit against appellee. It had issued to Sam Holland as owner of the truck a policy of indemnity insurance, which was in force at the time of the accident. The policy contained this:

"The Insurance provided by this policy is so extended as to be available, in the same manner and under the same provisions as it is available to the named Assured, to any person or persons while riding in or legally operating any of the automobiles described in the Declarations or to any persons, firm or corporation legally responsible for the operation thereof. * * *

"No action shall lie against the Company to recover for any loss under this policy, unless it shall be brought after the amount of such loss shall have been fixed or rendered certain by final judgment against the Assured after trial of the issue. * * *

"The unqualified term 'Assured' wherever used in this policy shall include in each instance the named Assured and any other person, firm or corporation entitled to insurance under the provisions and conditions of this policy, but the qualified term 'Named Assured' shall apply only to the assured named and described in Declaration No. 1. Any insurance under this policy shall be applied first to the protection of the Named Assured and the remainder, if any, to the protection of any other Assured."

Under the first quoted clause, supra, Day seems to have been an assured. He had charge of and was directing the operation of the truck.

The policy further provided that appellee would defend any suits against assured; that the assured would give immediate written notice of any accident covered by the policy; that appellee reserved the right to settle any claim or suit; that the assured should aid in effecting settlements when requested by appellee, and in securing information and evidence and the attendance of witnesses, and in prosecuting appeals; and that assured would render to the company at all times all co-operation within his power, and should not voluntarily assume any liability, or settle any claim, or incur any expenses, except at his own cost.

Holland and Day were sued jointly in the state court by the Snyder child, and Mrs. Findlay sued Holland, Day and La Vare Snyder for the death of her child. Appellee's counsel defended Holland, and obtained an order of dismissal as to him. Day employed counsel of his own in both cases. The circumstances under which he did so and the resulting controversy over Day's selection and retention of counsel to defend him will be examined; inasmuch as the trial court held, in sustaining a motion for directed verdict in this case, that it was not Day's business to defend in the state court, "but having undertaken it he ought to have done it honestly, and having undertaken it and not having done it, it seems to me it would be a miscarriage of justice to let the plaintiff in this action take advantage of his failure to keep faith." The material facts in that respect are these: On the third day after the accident Holland and Day went to Mr. Egan in Salt Lake City, Utah, adjuster for the insurance company, and at the request of Egan, Day answered written interrogatories. His answers stating how the accident occurred were written down by Mr. Egan.

The two suits above mentioned were instituted about five weeks after the accident, and summons in each was served on Day. He testified that he took the summons in each case to Mr. Egan, and the latter took him to the office of Mr. Gardner, appellee's attorney; that he left them with Mr. Gardner; that he told Mr. Gardner he understood the policy provided that appellee would defend him; that Gardner answered he did not think so; that he then asked Gardner what he would charge Day to defend him. Gardner replied that inasmuch as he was already in the case to defend Holland he would charge Day $50 as retainer and $25 a day while working on the case; that he

told Gardner he did not have any money, and Gardner asked him if he could not get the money from Mr. Holland; and he told Gardner he did not think so, but that he would go out and see Mr. Holland anyway; that he left Mr. Gardner's office, met Mr. Holland on the street, and Mr. Holland referred him to his attorney, Mr. Liberman; that he went to Liberman, and Liberman told him he would defend him. He did not return to Gardner's office at that time.

As to that conversation, Gardner testified that he told Day he presumed that it would be his duty to defend Holland, but he did not know whether he would have to defend Day; that he had not seen the policy; that if the policy did not require him to defend Day he would charge Day half of what he ordinarily charged, $50 as a retainer and $25 a day; that he told Day to go out and see Holland and come back in about an hour, and that in the meantime he would look up the policy and tell him whether he would represent him in behalf of the insurance company; that he later saw the policy, and that it provided that the company would defend Day, and on November 12, 1930, he wrote a letter to Day, whose home was at Cedar City, in which he said,

"The insurance company would take care of your case. I am therefore, going to appear as attorney for Mr. Holland and yourself in both of the cases which have been filed against you. * * *

"Permit me to make it emphatically clear that the insurance company does not authorize you or anyone else, in the policy or otherwise, to employ an attorney other than myself, who am the regular attorney for the insurance company. If you have employed Mr. Liberman, it will be entirely at your own expense, and the insurance company cannot, and will not, pay anything towards such employment."

Shortly thereafter Gardner, as attorney for Day, filed a general demurrer, also a special demurrer and a motion to strike parts of the complaint. Gardner in his letter of November 12, 1930, to Day requested Day to call at his office the next time he should be in Salt Lake City to confer with him regarding an answer to be filed. Day testified that he was not in Salt Lake City until the early part of the following March, and went to Gardner's office on that occasion. Gardner first saw Day after writing him, late in January, 1931, when he was in Cedar City. He sent for Day, and had a conference with him. Again Day and Gardner do not fully

agree as to what was said on that occasion. Day testified that in response to Gardner's questions he told him who was in the truck at the time the accident occurred; that immediately after the accident Mr. Snyder in his distress was berating himself for having caused the accident; and that he told Snyder he was not any more to blame than was Day himself, because the brakes on the truck were defective and he had not thought to tell Snyder about it, and that he also directed Snyder to drive fast, because it was getting late. Gardner then asked him whether that was the way he intended to testify in court, and Day replied, "Yes"; and that Gardner said, "if that was the way I intended to testify the company refused to represent me at all." He said he told Mr. Gardner that he had not talked with any one with reference to what his testimony would be at the trial; that he had told Gardner the truth and would have to testify to the truth. Gardner then said he was through with Day.

Gardner testified that he called Day's attention to the fact that in his report to the adjuster he had stated that Snyder was responsible for the accident, to which Day made no reply.

In the present case Day testified that in his report he made truthful answers to Mr. Egan. He thought Mr. Egan wrote the substance of what he said, but in his language; that he did not read the entire report before he signed it; that he stated to Mr. Egan that Snyder was at fault, but he figured he was jointly at fault with Snyder, and that was what he stated to Mr. Egan. Egan did not refute this statement of Day. The question and answer in that respect are these:

"Q. Give your honest opinion as to who was at fault.

"A. G. L. Snyder who was driving the car at the time of the accident."

Day further testified that the first time he was in Salt Lake City after receiving Gardner's letter of November 12, 1930, was on March 5, 1931, and as requested in the letter of November 12th he went to Mr. Gardner's office on March 5th. Mr. Corey was with him. Day testified that he told Mr. Gardner he was willing to co-operate with him in any way he could. Gardner then asked him who sent him there, and Day replied that Mr. Tanner had. Gardner laughed and started talking to Mr. Corey. Tanner had brought the suit for Mrs. Findlay. As to that conversation, Corey testified in corroboration of Day's statement that he told

Gardner he was willing to co-operate and do anything he could to help; that Mr. Gardner asked Day on that occasion:

"Would you like to see Mrs. Findlay on the opposite side get some money?"

And Day answered:

"I would like to see justice done, whichever way it goes."

Gardner served notice on the plaintiff and his attorney in the Snyder case on December 1, 1931, wherein he stated that he had given them verbal notice of his withdrawal as Day's attorney on February 1st preceding. This written notice as served was filed in the state district court the next day after it was served, which was nine days before the default judgment against Day. Day was not in court at the time. That default came about in this way: Liberman, Day's attorney, had answered the original and two amended complaints in the Glenn Snyder case. He then left Salt Lake City permanently, going to St. Louis, Missouri, and a third amended complaint was filed in the Snyder case. Day testified that he had no means with which to employ an attorney after Liberman left. The third amended complaint stood unanswered, and finally Snyder's attorney served written notice that judgment by default would be taken against Day. A copy of this notice was taken to Mr. Gardner's office, but he would not accept service of it. However a copy was left at his office. He ignored it. Thereafter judgment by default was taken against Day. He gave no further attention to the case after Mr. Liberman went away. It is also said that Day testified for the plaintiff in the suit brought by Mrs. Findlay and admitted his liability. Mr. Gardner so testified. After appellee moved for a directed verdict in this case, the District Judge reviewed at length this controversy, and directed a verdict for appellee on the ground that Day acted in bad faith in not employing some other lawyer to represent him after Liberman went away and in permitting the judgment against him to go by default.

■ From all the facts there is no other rational conclusion than this, that Day submitted his defense in the state court and its control to Liberman as his attorney, that he never withdrew Liberman's authority, that Liberman, shortly before or soon after Gardner entered demurrers and his motion for Day, filed an answer for Day in the Snyder case which was a repudiation of Gardner's appearance and right to appear and control Day's defense, and that, because of the conduct of Day and his counsel Liberman in the respects just stated, appellee and its counsel never exercised control over Day's defense or participated therein, nor is appellee in any manner bound by the default judgment in that case against Day in the state court, nor are its rights under the policy affected thereby. When Day was sued as an assured, it was his duty, as it was Holland's duty, to comply with the obligations of the policy in order that indemnities promised would be available to him and those to whom he was liable. He must have known that Holland put his defense in the hands of appellee's attorney, and when Gardner wrote him on November 12th to call for a conference in order that his answer might be prepared Day gave the subject and the request no attention. His statements that he would co-operate with Gardner were empty pretenses when they are considered with his acts. He suffered a default. He did not ask Gardner to answer the third amended complaint when Liberman went away. We do not doubt, as the District Judge held, that Day acted in bad faith.

■ The policy further provided that assurer would pay "the expenses incurred by assured for such immediate medical and surgical relief as is imperative at the time of the accident. * * *" Day took the injured to a hospital and incurred charges of $100. He employed Mr. K. C. Tanner as his attorney and brought a suit against appellee on October 28, 1931. The complaint contained two counts. In the first count Day sued for $1,000 as a fee for his attorney Liberman in defending the suit brought against him, Holland and Snyder by Mrs. Findlay for the death of her child on which judgment was recovered against Day. Tanner was Mrs. Findlay's attorney. In the second count Day sued appellee for the $100 medical and surgical charges. Appellee admitted its liability therefor, and the court in April, 1932, four months after the judgment in the state court in the Snyder case, ordered that appellee pay the $100. It did so. Appellant here contends that that admission of liability and payment constitute an estoppel or waiver precluding appellee from denying liability in this case. The two claims are entirely different in origin. One is wholly contractual, the other ex delicto. One arose after the accident, the other at the time and as a part of it. There is no connection between them. They rest on different principles. An admission of liability on one has no relevancy on the other. So far as the policy deals with them they are separate and severable. The contention is without merit.

The policy consists of three parts under headings, "Declaration, General Insuring Agreements, and Provisions." Under "Declarations" we find this:

"1. Name of Assured: Sam Holland.

"2. Address of Assured: Cedar City, Utah. * * *

"4. Assured's occupation or business is: Merchant.

(The truck is then described.)

"9. The above described automobile will not be rented or used to carry passengers for a consideration or used to tow or propel a trailer or vehicle used as a trailer, and the purposes for which they will be used are,

"(a) Private passenger type automobiles—pleasure and business purposes.

"(b) Commercial vehicles—only in the business as described in Declaration No. 4, including loading and unloading and incidental pleasure use for the Named Assured's family.

"Except as follows: No exceptions."

Under "General Insuring Agreements" we find this:

"1. To insure the Assured against loss and/or expenses resulting from claims upon the Assured for damages on account of

"(a) Bodily injuries, including death, at any time resulting therefrom, to any person or persons, * * *

"Accidentally Suffered or Alleged to Have Been Suffered while this policy is in force by reason of the ownership, maintenance or use within the limits of the United States of America, * * * or Canada, of any 'automobile described in the Declarations."

Under "Provisions" in the policy we find this:

"And the policy does not cover while any automobile insured hereunder is being used for any purpose other than specified in Declaration No. 9. * * * *"

■■ Of course, appellee's liability is only contractual and must be determined by the terms of the policy. Plainly this truck was a commercial vehicle, and its use is restrained under the policy by 9(b) of Declarations. Under said clause (b) it was provided that the truck could be used only in the business as described in Declaration No. 4—that is, in the business of Sam Holland as a merchant, including loading and unloading and incidental pleasure use of the named assured's family, no exceptions. The named assured

was Sam Holland. This excluded its incidental pleasure use by all others than the named assured's family, "no exceptions." Obviously those riding in the truck with Day at the time of the accident were not the named assured's family, or members thereof, and under the facts the four persons riding with Day, including the two children were in the truck as "incidental pleasure use" of it. Had they paid a consideration as passengers they would have been excluded under the forepart of said paragraph 9; and the policy under the clause quoted supra expressly provides that it "does not cover while any automobile insured hereunder is being used for any purpose other than as specified in Declaration No. 9." Thus the contract in plain terms excludes liability of appellee on the undisputed facts of this case. The judgment in its favor is, therefore, affirmed.

McDERMOTT, Circuit Judge (concurring in the result).

The policy prohibited Day from interfering with the defense of the suit in the state court, and required him to co-operate, in good faith, in that defense. If Day breached the policy in either respect, there can be no recovery herein.

A reading of the record convinces me that in Day's dealings with Gardner, he was rendering lip service only to the terms of the policy; that he was in fact guided by Liberman's advice, and that his real assistance was on the plaintiff's side of the lawsuit. I do not believe he turned the control of the defense to Gardner, nor co-operated in good faith in his own defense. I was of the opinion that these affirmative defenses, here interposed to the policy, should go to the jury—first, to resolve the conflict between Day and Gardner's testimony; and second, to draw the necessary inferences after the conflict was resolved, in accordance with the principles so well stated in Prinsen v. Travelers' Prot. Ass'n (C. C. A. 10) 65 F.(2d) 841. But being well satisfied that this litigation is a family effort to enrich themselves at the expense of the appellee and the insuring public, I yield to the judgment of my associates and the trial court.

I concur on this ground only, for I am not satisfied that this truck, hauling salt for the named assured, was not being used commercially because the driver took along some relatives without authority. It was, to say the most, a dual use, the primary use being commercial and covered. I doubt if an owner's liability insurance is suspended whenever

a driver picks up a friend. Such defense, moreover, would be waived if the insurance company, with knowledge of the facts and without reservation, assumed actual control of the litigation and the right to settle. Meyers v. Continental Casualty Co. (C. C. A. 8) 12 F.(2d) 52, 55; New Jersey Fidelity & Plate Glass Ins. Co. v. McGillis (C. C. A. 10) 42 F.(2d) 789, 791; 72 A. L. R. 1419.