United States Court of Appeals,

Fifth Circuit.

No. 91–1857.

Phillip DAVENPORT, Jr., Plaintiff–Appellee,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant–Appellant.

Dec. 9, 1992.

Appeal from the United States District Court for the Southern District of Mississippi.

Before VAN GRAAFEILAND[*]*, KING and EMILIO. GARZA, Circuit Judges.

VAN GRAAFEILAND, Senior Circuit Judge:

St. Paul Fire and Marine Insurance Company ("St. Paul") appeals from a judgment in favor of Phillip Davenport, Jr. in the amount of $20,125,000. For the reasons that follow, we reverse the judgment and remand to the district court with instructions to dismiss the complaint.

THE FACTS

On June 25, 1984, Judith Yearwood was undergoing relatively low-risk surgery at Methodist Hospital in Hattiesburg, Mississippi. Dr. William Pace was the surgeon and appellee Davenport was the nurse anesthetist. During the operation, something went tragically awry, and Mrs. Yearwood was taken from the operating room in a coma from which she never recovered. Four days later, a hospital nurse negligently dislodged Mrs. Yearwood's nasotracheal tube, and Mrs. Yearwood died the next day. St. Paul insured the Hospital under a policy that also covered its employees, Davenport and the negligent nurse, but did not cover Dr. Pace.

Dr. Pace blamed Davenport for the operating room mishap, contending that Davenport improperly supplied oxygen and failed to keep Dr. Pace informed of Mrs. Yearwood's deteriorating condition. Davenport contended on the other hand that Dr. Pace negligently cut Mrs. Yearwood's fallopian tube thus allowing $CO_2$ to enter her blood stream and bring on a cardiac arrest. Davenport also contended that some improper changes were made in the operative record to cover up what

*Senior Circuit Judge of the Second Circuit, sitting by designation.

actually had occurred.[1]   After Mrs. Yearwood's death, a co-administrator of her estate sued Davenport and the Hospital.  St. Paul undertook their defense and assured both of them that they had full and adequate coverage, a fact that Davenport never has disputed.  Despite his lack of personal exposure, however, Davenport expressed dissatisfaction with the attorney retained by St. Paul to defend him and the Hospital.  He contended that the attorney was not focusing sufficiently on the conduct of the negligent nurse as the cause of Mrs. Yearwood's death.  He also disagreed with the attorney's tactic of not making pretrial disclosure of information the attorney had received concerning alleged changes in the hospital record, the attorney preferring to save the information for use in his cross-examination of Dr. Pace.  Davenport and his personally retained attorney demanded the right to have the attorney defend him at St. Paul's expense.

> St. Paul's policy, however, contained the following pertinent provisions:
>
> We'll defend any suit brought against you or any other protected person for covered claims, even if the suit is groundless or fraudulent.  We have the right to investigate, negotiate and settle any suit or claim if we believe that is proper.  We'll pay all costs of defending the suit, including interest on that part of any judgment that doesn't exceed the limit of coverage.  But we won't defend a suit or pay a claim after the limit has been used up in paying judgments or settlements.
>
> We'll also pay all reasonable costs that you or any protected person incur at our request while helping us investigate or defend a claim or suit.
>
> If an accident or incident occurs that may involve this policy, you or any other protected person involved must ... [n]ot assume any financial obligation or pay out any money without our consent.

In order to pacify Davenport and secure his cooperation, St. Paul hired a second lawyer to represent him.  However, it refused to retain and pay the lawyer whom Davenport wanted.

The case proceeded to trial with the bulk of the defense being handled by the two attorneys retained by St. Paul, and Davenport's personally retained attorney playing only a minor role.  The jury returned a verdict of $150,000 against the Hospital but exonerated Davenport from liability.  Instead of rejoicing in his exoneration, Davenport brought this suit on November 12, 1986 to recover his self-incurred expenses in preparing his defense and hiring his lawyer, plus $6 million for emotional

---

[1]A more complete discussion of the surgical contretemps can be found in *Shutze v. Pace,* 557 So.2d 776 (Miss.1990).

distress and punitive damages based on St. Paul's alleged breach of contract, bad faith, etc., in refusing to hire the lawyer selected by Davenport.

In May of 1987, Davenport was discharged by the Hospital because of actions that were "disruptive to the organization", "outbursts" with other employees and nurses, and "employee/employer incompatibility." Witnesses from the Hospital and St. Paul testified that St. Paul had nothing to do with the discharge, and there was no evidence to the contrary.

Following Davenport's firing, he applied three times to St. Paul for personal insurance coverage and was rejected on each occasion. St. Paul's stated reason for these rejections was that its relations with Davenport were very adversarial and had deteriorated to such an extent that the handling of any future claims would be very difficult.[2] Davenport then broadened the claims made in his pending action, assert ing that St. Paul was the only carrier in Mississippi writing individual coverage for nurse anesthetists and that St. Paul's refusal to provide him with coverage handicapped him in securing employment and was a malicious interference in his business. The evidence submitted in support of Davenport's alleged difficulties in securing insurance and employment is far from convincing. However, because the evidence is not dispositive of the issues before us, we see no need to discuss it.

The $20,125,000 judgment that Davenport secured is made up of the following elements:

Failure to afford Davenport a defense         $    25,000

Intentional interference with Davenport's business relations   100,000

Infliction of emotional distress         5,000,000

Punitive damages      15,000,000

For convenience of discussion, we address St. Paul's obligation to defend and its obligation to insure separately.

THE OBLIGATION TO DEFEND

---

[2]Davenport concedes in his appellate brief that St. Paul "declined coverage only because of Davenport's actions in the medical malpractice suit and his subsequent suit against St. Paul as a result of the Yearwood litigation" and "because he was unhappy and any future claims handling might be difficult." Brief at 46.

The above-quoted provisions in St. Paul's policy are "customary provisions." *See American Home Assur. Co. v. Hermann's Warehouse Corp.,* 117 N.J. 1, 3–4, 563 A.2d 444 (1989). As stated in 44 Am.Jur.2d *Insurance* § 1393 at 326:

> Clauses are usually found in policies of liability insurance giving the insurer the right to make such investigation, negotiation, and settlement of any claim or suit as it deems expedient. Such policies usually also contain a clause which prohibits the insured from voluntarily assuming any liability, settling any claims, incurring any expense, or interfering in any legal proceedings or negotiations for settlement, unless with the consent of the insurer. The purpose of such provision is to prevent collusion as well as to invest the insurer with the complete control and direction of the defense or compromise of suits or claims, and there is no doubt as to the validity of such provisions.

It is a general rule of law, in Mississippi as elsewhere, that where an insurance contract is plain and unambiguous, it cannot be rewritten by the court. *See Interstate Life & Accident Co. v. Matthews,* 222 Miss. 821, 827, 77 So.2d 297 (1955). In accordance with our standard procedures, *see Ross v. Western Fidelity Ins. Co.,* 872 F.2d 665, 668 (5th Cir.1989), we have reviewed *de novo* the above-quoted clauses from the St. Paul policy. We hold, as numerous other courts have done in construing similar clauses, that they are unambiguous and give the insurer the right to assume control of the defense of an action against the insured to the exclusion of the latter. *American Casualty Co. v. Timmons,* 352 F.2d 563, 568–69 (6th Cir.1965); *American Home Assur. Co. v. Hermann's Warehouse Corp., supra,* 117 N.J. at 5–6, 563 A.2d 444; *Marginian v. Allstate Ins. Co.,* 18 Ohio St.3d 345, 347, 481 N.E.2d 600 (1985); *Louisiana Farm Supply Co. v. Federal Mut. Ins. Co.,* 409 S.W.2d 239, 240–41 (Mo.Ct.App.1966); *Snyder v. National Union Indemn. Co.,* 65 F.2d 844, 845, 847 (10th Cir.1933), *cert. denied,* 291 U.S. 665, 54 S.Ct. 440, 78 L.Ed. 1056 (1934); 7C J. Appleman, *Insurance Law and Practice* § 4681 (Berdal rev. 1979).

As aptly put by one court, "[t]he obligation to defend the insured is not to be regarded simply as a duty owed to the holder of the policy but also as an essential right which the insurance company reserves to itself in order to protect itself against unwarranted liability claims." *Podolsky v. Devinney,* 281 F.Supp. 488, 499 (S.D.N.Y.1968). This court has said more succinctly that an insurer has "both the right and the duty to defend suits against its insureds." *State of Mississippi v. Richardson,* 817 F.2d 1203, 1207 (5th Cir.1987). The district court's statement that the pertinent provisions in St. Paul's policy were ambiguous and "can easily be interpreted to include coverage for an attorney

selected by the insured," is manifestly erroneous.

The insurer's right to control the defense is at its strongest where, as here, the potential liability is solely that of the insurer. Adequate coverage for the potential liability being conceded, control by the carrier is virtually absolute, since the insured has no exposure whatever. St. Paul's retained attorney explained this very carefully to Davenport's personal attorney in a letter, from which we quote the following informative excerpts:

> However, as I expressed to you, in my opinion there is absolutely no conflict in the defense of the interests Methodist Hospital and Dick Davenport. In the first instance, there are no issues as to the existence of coverage and/or the adequacy of the amount of coverage. Accordingly, Dick Davenport can suffer absolutely no monetary loss by the payment of Judgment regardless of the outcome of the litigation. Secondly, the fortunes of the lawsuit as to both Defendants are inextricably bound to the fortunes and/or misfortunes of Dick Davenport's defense. In other words, unless we are successful in totally exonerating Dick Davenport, the lawsuit will be lost. Because of the doctrine of respondeat superior unless we're successful in cogently demonstrating to the jury that Dick Davenport did nothing wrong in the performance of the anesthesia services on June 25, 1984, the Methodist Hospital, the Co–Defendant, will be responsible in damages. Consequently, the Methodist Hospital has absolutely no interest to be served by attempting to point the finger at Dick Davenport's conduct on June 25. Rather, their exclusive interest lies in his exoneration.

> ....

> ... Seemingly, Mr. Westbrook [one of Davenport's personal attorneys] is of the opinion and has communicated to Mr. Davenport that, by pointing the finger to the second incident some benefit could somehow inure to Mr. Davenport's defense. As I discussed with you, that is simply not the case from a theoretical point of view, much less from a practical one. Assuming arguendo that the second incident contributed to Ms. Yearwood's ultimate demise, unless it could be proved and the jury believed that Ms. Yearwood would have fully recovered from the coma caused by the brain damage she suffered during the surgery on June 25, in which Mr. Davenport was performing the anesthesia services, Mr. Davenport would not at all be insulated by the second incident. There is no reasonably possible scenario, in my opinion, whereby this second incident could be construed as a superseding intervening cause thereby insulating participants in the surgery of June 25, 1984 from the consequences of their negligence, if any.

> Rather, the second incident can only serve as a "red herring" for Plaintiff's counsel in an attempt to "bait and switch" i.e. talk about the unrefutable negligence occurring in the second incident in an attempt to bootstrap all the damages suffered from the June 25 surgery by the Plaintiff to that incident. From a medical point of view, the second incident made absolutely no contribution to the ultimate death of Judy Yearwood. Subsequent to the surgery on June 25, Judith Yearwood's EEG demonstrated a "burst suppression pattern"; in my opinion you will not find a competent neurologist who will render an opinion that there is even a reasonable possibility that a person will have any significant improvement with an EEG demonstrating that type of pattern. Without any real question, from a clinical standpoint, Judith Yearwood was dead on June 25.

The issue of control sometimes arises in cases where the insurer settles within the policy limits

a case that the insured, for some reason dehors the contract, does not want settled. The consensus of the courts that have considered this question is that, absent a policy rider to the contrary, such settlement is the exclusive prerogative of the carrier. *See, e.g., Jayakar v. North Detroit General Hosp.,* 182 Mich.App. 108, 111–12, 451 N.W.2d 518 (1989); *Feliberty v. Damon,* 72 N.Y.2d 112, 116, 531 N.Y.S.2d 778, 527 N.E.2d 261 (1988); *Mitchum v. Hudgens,* 533 So.2d 194, 196–97 (Ala.1988); *Commercial Union Assur. Companies v. Safeway Stores, Inc.,* 26 Cal.3d 912, 919, 164 Cal.Rptr. 709, 610 P.2d 1038 (1980); *Savard v. Selby,* 19 Ariz.App. 514, 517–18, 508 P.2d 773 (1973).

Where coverage is full and complete, the same right that an insurer exercises in its settlement negotiations are exercisable by it in its choice of counsel. "Because the company is footing the bill for the defense, and will be obligated to pay any judgment rendered (if it does not settle the case), it is clearly entitled to select the attorney and conduct the defense." *Hartford Accident & Indemn. Co. v. Foster,* 528 So.2d 255, 269 (Miss.1988). "Such duty to defend, under the standard and commonly used liability policies, gives the insurer the exclusive right to select defense counsel, as long as the damages demanded are within the limits and if coverage has been accepted by the insurer." P. Magarick, *Excess Liability, Duties and Responsibilities of the Insurer,* 1982 § 3.06 at 52. "If the insurance policy provides complete coverage ..., no conflict of interest can exist, since the insurer alone would ultimately be responsible for the entire judgment." A. Windt, *Insurance Claims and Disputes* § 4.21 n. 176 (2d ed.1988).

Even where, as here, a carrier insures codefendants, if their coverage is sufficient to relieve each defendant of any possible personal liability and there are no cross-claims between the two insureds that require separate representation, it is difficult to conceive of any conflict of interest that would require separate legal representation. In any event, no such conflict exists in the instant case, and the district court erred in permitting the jury to find otherwise.

Assuming for the sake of argument only that Davenport was entitled to separate representation, St. Paul had the clear contractual right to select the attorney who would represent him. Davenport concedes that the lawyer selected by St. Paul represented him effectively and, of

course, successfully. Under the circumstances, Davenport's contention that he has a cause of action against St. Paul because he was not given the right to tell the company which lawyer to hire, is completely without merit. *See, e.g., New York State Urban Dev. Corp. v. VSL Corp.,* 738 F.2d 61, 65–66 (2d Cir.1984); *Suffolk County Patrolmen's Benevolent Ass'n v. County of Suffolk,* 595 F.Supp. 1471, 1480–82 (E.D.N.Y.1984), *aff'd,* 751 F.2d 550 (2d Cir.1985); *Goldberg v. American Home Assur. Co.,* 80 A.D.2d 409, 411–12, 439 N.Y.S.2d 2 (N.Y.1981); *Yeomans v. Allstate Ins. Co.,* 130 N.J.Super. 48, 53–54, 324 A.2d 906 (1974); *Hoffman v. Allstate Ins. Co.,* 21 Misc.2d 583, 584–86, 188 N.Y.S.2d 408 (N.Y.Sup.Ct.1959).

In *County of Suffolk, supra,* the district court noted that, even in criminal cases where the Constitution guarantees a defendant the right to counsel, the defendant is not guaranteed an absolute right to counsel of his choice. *Id.* at 1482 n. 13. Where, as here, an insured's contract specifically deprives him of that right and he has suffered no monetary loss, he has no cause to complain about the carrier's exercise of the right he ceded to it.

We hold that St. Paul fully complied with its contractual duty to defend Davenport and had the clear contractual right to conduct that defense in the manner that it did. St. Paul and its shareholders should not now be penalized simply because Davenport did not approve of his attorney's litigation strategies.

### THE OBLIGATION TO INSURE

A plaintiff who suggests the formation of a business relationship with a defendant, during litigation in which he is accusing the defendant of egregious wrongdoing, possesses more than a minimum degree of chutzpah, particularly where, as here, the accusations are completely without merit. St. Paul would have been foolish indeed to risk further problems with Davenport by taking him on as a personal insured, a relationship that did not theretofore exist. Clearly, there was no legal requirement that it do so.

Absent a statutory or constitutional mandate to the contrary, the general rule, in Mississippi as elsewhere, is that everyone has the right to decide with whom he will do business. "The law of tort is well established that an individual can refuse to enter into a contract or to maintain a business

relationship terminable at will for any reason sufficient to himself." *Fulton v. Hecht,* 580 F.2d 1243, 1250 (5th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979). "Absolute rights, including ... the right to enter or refuse to enter into contractual relations, may be exercised without liability for interference without reference to one's motive as to any injury directly resulting therefrom." 45 Am.Jur.2d *Interference* § 23. " "[T]he right to refrain from contracting is an absolute right, which every man can exercise justly or unjustly, for a good purpose or for a bad purpose, maliciously, in the popular sense of the term, or benevolently.' " *Rothermel v. International Paper Co.,* 163 N.J.Super. 235, 244, 394 A.2d 860 (App.Div.1978), *cert. denied,* 79 N.J. 487, 401 A.2d 242 (1979) (quoting *Alfred W. Booth & Bro. v. Burgess,* 72 N.J.Eq. 181, 190, 65 A. 226 (Ch.1906)). "[I]t is immaterial by what motive one is prompted in the exercise of a clear legal right...." *Lancaster v. Hamburger,* 70 Ohio St. 156, 164, 71 N.E. 289 (1904). "It is true that a person has the right to refuse to have business relations with any person whomsoever, whether his refusal is the result of caprice or malice, without laying himself liable to action therefor...." *Standard Fruit & Steamship Co. v. Putnam,* 290 So.2d 612, 615 (Miss.1974) (quoting *Wesley v. Native Lumber Co.,* 97 Miss. 814, 820, 53 So. 346 (1910)).

The foregoing legal principle applies generally in the field of insurance law. *See* Appleman, *supra,* § 7121; 1 Couch, *Cyclopedia of Insurance Law* § 7.9 (2d ed.1984); 43 Am.Jur.2d *Insurance* § 204. It applies specifically to insurance companies, such as St. Paul, who operate in Mississippi. "In Mississippi, an insurer is under no duty to insure every applicant and is in fact free to state the terms upon which insurance may be obtained." *Gladney v. Paul Revere Life Ins. Co.,* 895 F.2d 238, 241 (5th Cir.1990); *Interstate Life & Accident Ins. Co. v. Flanagan,* 284 So.2d 33, 36 (Miss.1973); *Savage v. Prudential Life Ins. Co.,* 154 Miss. 89, 121 So. 487, 489 (1929).

The district court clearly erred in instructing the jury, in reliance on Miss.Code Ann. § 83–5–33, that St. Paul had a general duty to refrain from unfair practices and it was for the jury to determine whether St. Paul engaged in unfair practice in refusing to provide Davenport with coverage. Section 83–5–33 is not applicable to the facts of the instant case. Moreover, it does not provide for a private right of recovery. *See Watson v. First Commonwealth Life Ins. Co.,* 686

F.Supp. 153, 155 (S.D.Miss.1988). In sum, we hold as a matter of law that St. Paul was within its rights in refusing to issue a personal liability policy to Davenport as a named insured, and the jury should not have been permitted to find otherwise.

Because Davenport failed to establish any cause of action against St. Paul, he has no right to recover punitive damages. *See Vidrine v. Enger,* 752 F.2d 107, 110 (5th Cir.1984).

We reverse the judgment of the district court and remand to the district court with instructions to dismiss the complaint.

REVERSED.