163 N.J. Super. 235 (1978)
394 A.2d 860
ALAN F. ROTHERMEL, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
INTERNATIONAL PAPER CO., A CORPORATION OF THE STATE OF NEW YORK, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 4, 1978.
Decided October 26, 1978.
*237 Before Judges FRITZ, BISCHOFF and MORGAN.
Mr. John C. Lifland argued the cause for appellant (Messrs. Stryker, Tams & Dill, attorneys; Ms. Jane S. Kimball on the brief).
Mr. Charles R. Church argued the cause for respondent (Messrs. Hannoch, Weisman, Stern & Besser, attorneys).
The opinion of the court was delivered by MORGAN, J.A.D.
In this appeal we are again asked to probe the outer perimeters of the tort known as unlawful interference with contractual relationships or with prospective economic advantage. See, e.g., Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173 (App. Div. 1978); McCann v. Biss, 65 N.J. 301 (1974); Harris v. Perl, 41 N.J. 455 (1964). The alleged tort arose not in the usual context of a broker deprived of a commission for which he had contracted, but rather of a large purchaser of paper who acted as an intermediary between a paper manufacturer and ultimate purchaser, and who claimed as damages loss of profits on resale when the manufacturer elected to eliminate all such intermediaries and brokers in its chain of distribution. The case was tried to a jury of six, and in a general verdict with specific interrogatories plaintiff was awarded $77,000 in compensatory damages. Judgment was entered in the amount of $90,923.24, reflecting an award of prejudgment interest. Defendant manufacturer appeals.
The facts are largely undisputed. Plaintiff Alan F. Rothermel was an intermediary in the sale of kraft paper manufactured *238 by defendant International Paper Company (International), to Western Electric and Printwrap, Inc. Western Electric used cable wrapping paper, a specific type of kraft paper, for wrapping telephone cables in order to prevent shorts in the telephone wires. Printwrap used ordinary kraft paper in its business of printing wrapping paper for magazines, roofing and siding.
Plaintiff's dealings with Western Electric predated by several years his purchase of cable wrapping paper from International for the Western Electric account. Those years were spent promoting the contracts which later were entered into, and there is no dispute that during those years plaintiff received no compensation for his efforts. After he achieved success, however, he took his compensation for his promotional efforts from the profits derived from those contracts. Defendant takes no particular dispute with the fact that plaintiff did expend substantial effort in this regard but argues that he did so for his own financial benefit, not at its or Western Electric's request. Indeed, Western was not made a party to this suit.
Plaintiff's efforts proved successful when they resulted in a succession of six one-year written supply contracts, renegotiated annually, between International and Western Electric. The first such contract was executed on August 1, 1967 and expired, by its express terms, on July 31, 1968. The last of the six contracts was executed on August 1, 1972 and was scheduled therein to expire on July 31, 1973. Each of these contracts, on a Western Electric form, named plaintiff as International's "merchant representative" through whom invoicing would be done, and the price indorsed on the written contract each year was the price charged by plaintiff to Western Electric. In practice, International invoiced plaintiff at a lower price agreed to by plaintiff and International; plaintiff invoiced Western at the higher price reflected in the International-Western Electric contract. The "spread" between those prices was plaintiff's compensation *239 which he admitted had been ample.[1] Although International invoiced plaintiff as agreed, the paper was shipped directly to Western Electric; plaintiff lacked all facilities for receiving, storing or shipping paper.
The six supply contracts provided for their early termination on 30 or 60 days' notice, subject only to certain limitations not here pertinent; none, however, provided for terms of extension of their duration. Each such contract contained an express stipulation that it represented the entire agreement and could not be modified except by a writing signed by both parties. As noted previously, the contracting parties were International and Western Electric with plaintiff being designated therein as International's merchant representative.
Plaintiff's efforts to develop paper sales to Printwrap predated the first such sale by two or three years during which time he solicited the then president of the company, Russell Buermann. Thereafter, sales of International's paper to Printwrap commenced at the rate of approximately a carload every three months. International never sold Printwrap pursuant to a written term contract similar to its contract with Western Electric. The sales to Printwrap were spot sales made when Printwrap would telephone orders to plaintiff for varying weights of paper and plaintiff would order the requested paper from International. Here, too, International invoiced Rothermel and the spread between the prices charged plaintiff and those he charged Printwrap constituted his compensation for services rendered.
This long-term course of dealing among the four parties, Printwrap and Western Electric as buyers, International, as seller, and plaintiff as intermediary continued until June 1973 when International implemented a change in the method of conducting its kraft paper business. The *240 testimony, undisputed, was that in 1973 the division of International then known as the "Kraft Paper Business" that serviced Printwrap and Western Electric was operating at a loss. In an effort to achieve profitability, International determined that it would reduce the large number of different paper products it was then manufacturing and would confine manufacturing to those products which could be produced efficiently and economically on existing equipment. Accordingly, during the spring of 1973 International manufactured only 26 different grades of paper instead of the 120 different kinds it had been producing previously.
In connection with the foregoing plan to improve profitability, International determined to cease dealing through brokers and intermediaries, such as plaintiff who, it was felt, produced primarily small customers requiring specialty type products, inconsistent with maximum efficiency in the use of its equipment. Hence, International determined to handle all sales through its own internal sales force which had itself been reduced in number to achieve economy. It would cultivate customers using standard type paper in large amounts, and then only those entering long term contractual commitments. Obviously, neither Western Electric nor Printwrap met International's new conception of a desirable customer. Western Electric had only committed itself on a yearly basis and the paper it needed was of a specialty type, unprofitable to manufacture. Printwrap was only a small customer of International's vast paper production and had no contractual commitment at all.
Plaintiff was notified of these plans on June 7, 1973 at International's office in New York and realized immediately their effect on his income from his sales to Western Electric and Printwrap. International told him that it was eliminating all brokers and intermediaries and would not entertain any business with Western Electric past the July 31st expiration date of its contract with that company. The letter confirming this meeting, dated June 12, 1973, notified *241 plaintiff that trade discounts on Printwrap paper would be discontinued as of August 31, 1973.
On July 13, 1973, apparently in confirmation of a prior meeting, International wrote Western Electric advising it that further contracts depended on Western's tolerance of "minor revisions in specifications" and "your willingness to execute our standard five year contract which has certain renewal options." An interim agreement had been made pursuant to which International would supply Western until January 1, 1974 while they explored the possibilities of a long-term commitment. The interim commitment was fulfilled[2] but a contract with Western Electric was never executed. The paper shipments to Western Electric under this interim plan, after International's June 7, 1973 business decision concerning brokers and other intermediaries, were invoiced to Western, but at the same price it had previously invoiced to plaintiff. Hence, International did not profit at plaintiff's expense; Western Electric did.[3]
With respect to Printwrap, International responded to pleas from plaintiff and principals of that company to continue supplying paper on an interim basis until a new source of supply could be found. Accordingly, International did continue to sell to Printwrap, but charged that company the same, or less, than what it had been charging plaintiff. Hence, here too, International did not appropriate to itself plaintiff's profits; rather plaintiff's customer was the beneficiary. Plaintiff's suggestion that International gained in the amount of trade discounts it had allowed on sales for Printwrap does not suggest a profit at plaintiff's expense. *242 At all times International was free to discontinue these discounts or change the price of paper it was selling plaintiff for resale.
At no time during the period in which International was selling paper through plaintiff to Printwrap and Western Electric did plaintiff ask International to enter into a written agreement with him covering his purchases of paper. Nor did he ever ask Printwrap for such a written commitment. The only writings that recognized plaintiff as figuring in the International-Western Electric sales were the six one-year contracts between those two parties. Plaintiff testified that it was not customary in the paper trade to obtain written commitments and he apparently assumed that none were necessary. In any event, he testified that he thought he was "covered" by the International-Western Electric contracts.
In his complaint plaintiff alleged that International, the only defendant, had breached a contract to sell paper to him which by industry custom and usage was renewable yearly so long as he performed satisfactorily, and, in addition, that International had failed to provide reasonable notice of termination of this alleged contract. He also alleged that International had tortiously interfered with his contractual relationships and his prospective economic advantage with Western Electric and Printwrap.
At the close of plaintiff's case International moved for a judgment of dismissal. The motion was denied. At the close of the evidence, when the motion was renewed, the trial judge dismissed those counts of the complaint alleging breach of contract and failure to provide reasonable notice of termination, holding that no evidence of a contract had been produced. The case was, however, permitted to go to the jury on the tortious interference counts.
Following the verdict in plaintiff's favor, the trial judge denied defendant's motion for judgment n.o.v. and granted plaintiff an award of prejudgment interest pursuant to R. 4:42-11(b).
*243 International claims error in the denial of its motions for judgment before and after verdict and its alternative motion for a new trial. It also appeals the award of prejudgment interest. Plaintiff cross-appeals from the trial judge's order dismissing the counts alleging breach of contract and failure to provide reasonable notice of termination.
This appeal focuses on defendant's principal contention that it committed no tort when it declined to continue selling paper to plaintiff notwithstanding its admitted knowledge of plaintiff's lucrative resale of the paper to Western Electric and Printwrap. According to this contention, International urges its absolute privilege to cease selling to plaintiff and that its acts, done in pursuit of its own business interest, were justified as a matter of law. Hence, when it exercised this privilege, it could not be held liable despite its knowledge that plaintiff would lose the profits he had been reaping during the several years the relationship had continued.
The first of plaintiff's two alternative theories of recovery involved establishing a contract implied from the several years' relationship he enjoyed with International. Despite the admitted absence of an express written, or even oral, contract with International, plaintiff alleged an implied contract from this course of dealing. In support it produced expert proof concerning custom or usage in the trade. Without recounting this evidence in full, we conclude, in agreement with the trial judge, that the evidence failed entirely to create even a jury question as to the existence of an implied contract with International. Hence, the trial judge properly withheld from the jury that issue and the one concerning defendant's failure to provide reasonable notice of the termination of this alleged implied contract.
Plaintiff's second theory of recovery sounds in tort. He contends that International had no right to stop selling paper to him for resale to Western Electric and Printwrap, at least without giving him reasonable notice of the termination of their relationship. According to plaintiff's brief and *244 the oral argument before us, a reasonable time, in light of the paper shortage obtaining at the time of termination, would have been no less than four years. Hence, plaintiff is arguing that despite the absence of contract, International was bound to continue selling paper to plaintiff for four years after International decided not to deal with him and notified him of that fact.
We conclude that plaintiff's position as articulated, or even one less extreme in its reach, is without merit and that the trial judge should have granted International's motion for judgment at the close of the evidence.
Basic to our free enterprise system is the right to enter or to refrain from entering or continuing a contractual relationship. Rejection of an offer, or termination of a contract in accordance with its express terms, is a right the exercise of which is unencumbered by the threat of tort liability. This principle has received recognition in New Jersey law. As early as 1906, in Booth & Brother v. Burgess, 72 N.J. Eq. 181 (Ch. 1906), it was announced:
[There are] two principles which * * * are established beyond question.
The first of these principles is the absolute right of all men to contract or refrain from contracting, which is one of the rights hereinbefore enumerated. The motives which actuate a man in refraining from making a contract in relation to labor or merchandise or anything else are absolutely beyond all inquiry or challenge. Self-evident as it may be, the proposition * * * has often been lost sight of that the right to refrain from contracting is an absolute right, which every man can exercise justly or unjustly, for a good purpose or for a bad purpose, "maliciously," in the popular sense of the term, or benevolently. [at 190]
That which one has a right to do cannot become a tort when it is done. In The Aalfo Co. v. Kinney, 105 N.J.L. 345 (E. &. A. 1929), plaintiff had a five-year contract with Blake Mfg. Co. to purchase all whistles manufactured by Blake. During the term of the contract a Blake shareholder was allegedly induced by other shareholders to institute dissolution proceedings in Chancery, as a consequence of *245 which Blake was dissolved, its assets sold and Blake's performance of its contract with plaintiff was thereby thwarted. Plaintiff sued the other shareholders alleging a tortious interference with plaintiff's contract on the ground that dissolution had been sought to prevent performance of the contract. In stating that so much of the complaint as rested on the alleged act of persuading a fellow shareholder to institute Chancery proceedings disclosed no cause of action, the court observed:
[T]he motive of the defendants in persuading a fellow stockholder to institute the suit is immaterial, for they only persuaded him to do what they would have had a legal right to do themselves. * * * "The legal pursuit of one's right, no matter what may be the motive of the promoter of the action, cannot be deemed either illegal or inequitable." [at 349]
In O'Connor v. Harms, 111 N.J. Super. 22 (App. Div.), certif. den. 57 N.J. 137 (1970), the court held that members of a board of education had the right to vote on a contract with the plaintiff principal and could not be held liable for interfering with his contract when they exercised that right. Law elsewhere is to the same effect. See, Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc., 531 F.2d 910 (8 Cir.1976); Beltronics, Inc. v. Eberline Instrument Corp., 369 F. Supp. 295 (D. Colo. 1973), aff'd 509 F.2d 1316 (10 Cir.1974), cert. den. 421 U.S. 1000, 95 S.Ct. 2399, 44 L.Ed.2d 667 (1975); Cunningham v. A.S. Abell Co., 264 Md. 649, 288 A.2d 157 (Md. Ct. App.), cert. den. 409 U.S. 865, 93 S.Ct. 160, 34 L.Ed.2d 114 (1972); House of Materials, Inc., v. Simplicity Pattern Co., 298 F.2d 867 (2 Cir.1962); Emery v. A & B Commercial Finishing Co., 315 P.2d 950 (Okl. 1957); Green v. Victor Talking Mach. Co., 24 F.2d 378, 381-382 (2 Cir.), cert. den. 278 U.S. 602, 49 S.Ct. 9, 73 L.Ed. 530 (1928); McMaster v. Ford Motor Co., 122 S.C. 244, 115 S.E. 244 (1923); Carpenter, "Interference with Contract Relations," 41 Harv. L. Rev. 728 (1928).
*246 The prevailing law in this respect has been synthesized in Restatement, Torts, § 762 at 37 (1939) as follows:
Privilege of selecting persons for business relations.
One who causes intended or unintended harm to another merely by refusing to enter into a business relation with the other or to continue a business relation terminable at his will is not liable for that harm if the refusal is not
(a) a breach of the actor's duty to the other arising from the nature of the actor's business or from a legislative enactment, or
(b) a means of accomplishing an illegal effect on competition, or
(c) part of a concerted refusal by a combination of persons of which he is a member.
Plaintiff admits that the exceptions to this rule are not here applicable and we agree. Although not contesting the generality of the principle just described, he contends that the manner in which International terminated the relationship, characterized by him as "comprehensive" and "egregious," merits imposition of tort liability. He places principal reliance on unlawful interference cases involving real estate brokers and particularly on the language used therein. See, for example, Harris v. Perl, 41 N.J. 455 (1964); Sustick v. Slatina, 48 N.J. Super. 134 (App. Div. 1957). Those cases are, in our view, inapposite. In each of them, the broker's prospective advantage with which the defendant interfered was secured by a fully enforceable contract. In Harris v. Perl, for example, the broker had an enforceable contract for a commission with the seller. Defendant buyer, knowing of the broker's expectation of a commission for his work in finding the buyer a home but wanting to obtain the property without paying the commission, surreptitiously dealt with the bank which, he learned, had obtained title to the desired premises. The court condemned his attempts to appropriate to himself the fruits of the broker's efforts on his behalf. In the instant matter, International did not seek the benefit of plaintiff's contract with another, but sought merely to end dealing wih middlemen. The direct sales to Western *247 Electric and Printwrap following termination on June 7, 1973 were at the same price as International had been selling to Western. Plaintiff does not seriously contend otherwise. Also, plaintiff had no contract with Western Electric or Printwrap. Rather, Western's relationship with International was characterized by sharply limited one-year commitments and although plaintiff may have assumed or expected continued renewals, he had no legally recognized right to them. The same is true with Printwrap. Printwrap was at all times free to buy from others on more advantageous terms if it could find them.
Fundamental to plaintiff's position is the view that his customers and supplier, by virtue of their prior course of dealing, were somehow in servitude to him for the indefinite future or until he could make other arrangements in the paper trade to secure similar income. According to this theory, tort law required International to continue selling to him. We have found no law to support this novel contention.
Ass'n Group Life, Inc. v. Catholic War Veterans, 120 N.J. Super. 85 (App. Div. 1971), mod. on other grounds, 61 N.J. 150 (1972), is not to the contrary. There, as in the broker cases, the essential element of the tort which was found to exist was the appropriation by the defendant, Catholic War Veterans, of the fruits of plaintiff's ingenuity and planning. As that court framed the issue:
* * * the tort question is whether it was fair dealing also to design and execute a plan to appropriate for itself AGL's expectancy in the renewal brokerage commissions * * * and also, in effect, to obtain broker's fees on new insurance certificates through what a jury might consider the subterfuge of adding AGL's former brokerage allowance to its (CWV's) newly acquired administrative allowance. [120 N.J. Super. at 99]
As to defendant NAL, the opinion is less clear. Nonetheless, it is inferable therefrom that the reason for NAL complicity in CWV's plan which the jury could find, on the evidence, *248 was to retain the business that had proved unprofitable under AGL. Plaintiff's thesis here, that unfair dealing, in the absence of contract, with no ingredient of personal profit at defendant's expense, and with no malicious intent to injure, constitutes a sufficient basis for tort, is both unsound and unsupported.
There is not the slightest suggestion in the record that International ceased doing business with plaintiff out of malice, or that it sought to enhance its profits at plaintiff's expense even were it to be assumed that elimination of a middleman can be a tort in given circumstances. Other brokers were eliminated and even International's own in-house sales force was reduced in number to achieve economy and efficiency in operation. A sensible response to the demands of business cannot be deemed tortious even where incidental economic damage is visited thereby on others.
Recognition of the consensual nature of the contract relationship necessarily includes the right of one not to consent to such a relationship. If one were to be held liable in tort for rejection of an offer to contract or for termination of an existing contractual relationship according to its terms, the characteristically consensual nature of the contract relationship would be undermined. Absent an express option contract, a duty to contract beyond the terms of the contractual relationship itself is a contradiction in terms.
This obtains in the face of the disappointed expectations of a party in the creation of a contract or the continuation of an existing one. In this respect, plaintiff's position differs little from the position of a valued employee at will whose employment has been terminated for reasons of economy or, for that matter, for no reason at all. The employee has lost his income from that job, but the basis on which he earned it was an employment at will, a wholly consensual relationship. Independent contractors, who derive most of their income from a single source, also can be disappointed and hurt economically when business from that source is no longer forthcoming for contractually permitted reasons. Law *249 firms whose volume of legal work is generated by the needs of one large client are frequently threatened when that client retains other counsel. Accountants servicing a large corporate client can also sustain business damage when the business is taken elsewhere. All that can be done is to secure a firm commitment or not become too dependent upon one source of business.
In this connection, plaintiff is no different. He was not without the means of self-protection. He could have achieved some security for his income by seeking a term contract from International. Failing that, during the period in which International was dealing with him, he could have sought other sources of his paper in order to protect himself against the hazards of what finally did occur. Apparently, plaintiff took no steps whatever in his own protection but rather rested content in the face of the obvious threat to his income that his at-will relationship with International involved.
We discern no basis for action against International on the evidence adduced. International was under no contractual duty to plaintiff to continue selling him paper. Although it was not obligated to give plaintiff notice of the termination of their seller-buyer relationship, it did so; he received approximately 60 days' notice of the termination of his relationship with International with respect to both the Western Electric and Printwrap accounts. International did not appropriate or seek to appropriate the profits plaintiff had been deriving from his sales to either customer. Even if it had, on this record we would not consider the termination of this consensual relationship as a basis for recovery in tort.
Accordingly, the portion of the trial court judgment dismissing plaintiff's contract claims is affirmed; the judgment in plaintiff's favor is vacated; judgment in defendant's favor is entered with respect to all claims.
NOTES
[1] Rothermel testified that in 1972, the last full year in which these relationships remained stable, he worked approximately 10 to 12 hours a week on both the Western Electric and Printwrap business from which he obtained a gross profit of $35,000.
[2] Actually, the last shipment under the interim commitment was in May 1974.
[3] After the 1971 wage-price controls were lifted in 1974, International's price to Western Electric on its last two invoices was slightly higher; the uncontradicted testimony was, however, that price increases applied to every customer and would have been charged to Rothermel had he been functioning as broker at the time.