277 N.J. Super. 175 (1994)
649 A.2d 399
VAN NATTA MECHANICAL CORPORATION, PLAINTIFF-APPELLANT,
v.
JOSEPH DI STAULO, INDIVIDUALLY, AND DI STAULO CONSTRUCTION CO., INC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 1994.
Decided November 3, 1994.
*178 Before Judges J.H. COLEMAN, DREIER and VILLANUEVA.
Jay R. Atkins argued the cause for appellant (Sunshine, Atkins, Minassian & Tafuri, attorneys; Mr. Atkins on the brief).
Sheppard A. Guryan argued the cause for respondents (Lasser, Hochman, Marcus, Guryan & Kuskin, attorneys; Mr. Guryan, of counsel and on the brief and Bruce H. Snyder, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiff, Van Natta Mechanical Corporation, appeals from the dismissal of its complaint for failure to state a claim upon which relief can be granted. R. 4:6-2(e). Plaintiff also appeals from the denial of its motion to amend its complaint. Plaintiff's initial *179 complaint alleged that defendants tortiously interfered with its contracts and prospective economic advantages and committed antitrust violations. It later sought unsuccessfully to amend its complaint to expand its count for the antitrust violations. This case explores the extent to which a business entity may refuse to deal with another in order to achieve anti-competitive effects upon a third party. We here determine that while some of the allegations of plaintiff's original complaint may have failed to state an actionable claim, its proposed amended complaint, the filing of which should have been permitted, stated at least one cognizable cause of action under New Jersey law.
Plaintiff is a mechanical subcontractor in the fields of electrical, plumbing, heating, ventilation and air conditioning. Over the past several years it has been a subcontractor to two competing contractors, defendant Di Staulo Construction Co., Inc. of which defendant Joseph Di Staulo is the principal and FSS Builders, Inc., both working in the affluent areas of Cresskill and Alpine in Bergen County. Plaintiff alleges that defendant[1] as general contractor controls approximately half of the building projects in these areas. For the last ten years, plaintiff performed a majority of defendant's plumbing work and a substantial portion of its heating, ventilating and air conditioning work. In 1991 alone, plaintiff grossed $800,000 in its business dealings with defendant.
Plaintiff alleged that in November 1991 there was a meeting called by Joseph Di Staulo with Donald Van Natta, the president of plaintiff. At that meeting, Joseph Di Staulo allegedly insisted that plaintiff immediately cease dealing with FSS, thereby breaching all existing contracts, and that in the future if FSS bid on any job for which defendant also was submitting a bid, plaintiff must quote prices to FSS at least ten percent higher than the prices quoted to defendant. Di Staulo allegedly informed Van Natta that if plaintiff would not immediately comply with these conditions, *180 defendant would no longer accept any plumbing or HVAC bids from plaintiff. This included any jobs for which defendant had recently been awarded the general contract and all other jobs that might be awarded to defendant in the future. These demands were reasserted over the next few months, and when plaintiff would not comply, defendant severed all business relationships with plaintiff after their ongoing projects were concluded.
Plaintiff instituted this action, asserting tortious interference with contractual obligations, intentional interference with prospective economic advantages and a violation of New Jersey's antitrust laws. Plaintiff's amended complaint attempted to flesh out the antitrust allegations.
Defendant contended that it had an absolute right to deal or not deal with plaintiff, that it could not interfere with its own contract, and that its motives were irrelevant. Defendants asserted that FSS has brought no claim based upon defendants' alleged actions, and that plaintiff is and was not a competitor of defendant with proper standing to assert the claims plaintiff has made. In short, defendants defend the antitrust allegations by contending that there were no anti-competitive injuries to plaintiff. Lastly, defendants assert that even if there were to be some theory of liability inculpating the corporate defendant, there is no theory of liability under which its principal, Joseph Di Staulo, would be liable.

I
We start with the proposition that consideration of a motion made pursuant to R. 4:6-2(e) (that plaintiff's complaint failed to state a claim upon which relief could be granted) requires that the complaint be searched to determine if a cause of action can be found within its four corners. As stated in Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989),
[A] reviewing court "searches the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." ... At this preliminary stage of the litigation the Court is not concerned with the *181 ability of plaintiffs to prove the allegation contained in the complaint.... For the purposes of analysis plaintiffs are entitled to every reasonable inference of fact.... The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.
[citations omitted; quoting DiCristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 252, 128 A.2d 281 (App.Div. 1957).]
As noted in Pressler, Current N.J. Court Rules comment 2 on R. 4:6-2 (1995), "Every reasonable inference is therefore accorded the plaintiff and the motion granted only in rare instances and ordinarily without prejudice."[2]See also Lieberman v. Port Authority, 132 N.J. 76, 79, 622 A.2d 1295 (1993), cautioning: "Courts should approach motions to dismiss for failure to state a cause of action pursuant to Rule 4:6-2(e) with caution. Because such motions are usually brought at the earliest stages of litigation, they should be granted in `only the rarest instances'." (Quoting Printing Mart-Morristown v. Sharp Electronics, supra, 116 N.J. at 772, 563 A.2d 31).

II
The facts in this case present an odd variant of the usual claims of interference with a present contract or prospective contractual advantage. If plaintiff had complied with defendants' demands, plaintiff would have suffered no damage in its relationship with defendant, because the relationship between the companies would presumably have continued as before. Plaintiff may possibly have lost some contracts with FSS because of its ten percent higher bids to FSS and would have been subject to breach of contract claims concerning the current jobs where plaintiff would have been forced to withdraw its workers. In addition, plaintiff may have caused itself to be a co-conspirator with defendants in its alleged attempts to monopolize the building business in the area. It is only because plaintiff refused to breach its existing contracts with FSS and to give FSS inflated bids in the future that it has suffered the loss of all future business with defendant, ending a *182 ten-year association. We here must decide whether defendant's commercial practice falls within or without the protection of the civil law.
There is no question that New Jersey law protects both contracts and prospective business relationships from tortious interference. The plaintiff in Printing Mart-Morristown v. Sharp Electronic Corp., supra, was a printer who alleged intentional interference with its prospective economic relations concerning a printing bid submitted to Sharp. The Court noted that New Jersey law protects a party's interest in reasonable expectations of economic advantage and may find actionable interference even when there is no enforceable contract. 116 N.J. at 750, 563 A.2d 31. A complaint based on tortious interference must first show some protectable right which "need not equate with that found in an enforceable contract," so long as there are "allegations of fact giving rise to some `reasonable expectation of economic advantage.'" Id. at 751, 563 A.2d 31, (quoting Harris v. Perl, 41 N.J. 455, 462, 197 A.2d 359 (1964)). Next, the complaint must allege that the defendant's actions were intentional and malicious, but "malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." Ibid. Third, a plaintiff must show that the interference caused the loss of a prospective gain in that there "was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." Ibid. Lastly, there must be proof that the injury caused the plaintiff damage. Id. at 752, 563 A.2d 31.
Fundamental to the cause of action, however, is a requirement that the claim be directed against defendants who are not parties to the relationship. Ibid. One cannot interfere with one's own economic relationship, since in such an instance the matter is governed by principles of contract law. Id. at 753, 563 A.2d 31. This latter requirement justified the dismissal of plaintiff's claims based on interference with contract and prospective economic relations. Additionally, defendants did not interfere *183 with plaintiff's contract or prospective economic relations with FSS, although an unsuccessful attempt was made.
These principles, however, do not cover all actions in which one business entity may visit economic harm upon another. While plaintiff phrased its complaint in terms of tortious interference, the gravamen of the complaint was a refusal to deal motivated by improper purposes. The Supreme Court has stated that "[b]efore a contract is formed, either party may withdraw from negotiations without penalty." Printing Mart-Morristown, 116 N.J. at 753, 563 A.2d 31. But, the right of one party to refuse to deal with another is not absolute. The Restatement of Torts § 762 (1939) states:
Privilege of selecting persons for business relations.
One who causes intended or unintended harm to another merely by refusing to enter into a business relation with the other or to continue a business relation terminable at his will is not liable for that harm if the refusal is not
(a) a breach of the actor's duty to the other arising from the nature of the actor's business or from legislative enactment, or
(b) a means of accomplishing an illegal effect on competition, or
(c) part of a concerted refusal by a combination of persons of which he is a member.[3]
Rothermel v. International Paper Co., 163 N.J. Super. 235, 246, 394 A.2d 860 (App.Div. 1978), certif. denied, 79 N.J. 487, 401 A.2d 242 (1979), is one case recognizing § 762. See also Levin v. Kuhn Loeb & Co., 174 N.J. Super. 560, 575, 417 A.2d 79 (App.Div. 1980). In Rothermel, "a large purchaser of paper who acted as an intermediary between a paper manufacturer and ultimate purchaser *184 ... claimed as damages loss of profits on resale when the manufacturer elected to eliminate all such intermediaries and brokers in its chain of distribution." 163 N.J. Super. at 237, 394 A.2d 860. The manufacturer reduced the number of different paper products it manufactured and commenced handling sales through its internal sales force which it reduced in size. Savings were passed on to the customer.
Judge Morgan found in Rothermel that the Restatement section quoted earlier reflected New Jersey law, she having first established that "[b]asic to our free enterprise system is the right to enter or refrain from entering or continuing a contractual relationship." Id. at 244, 394 A.2d 860 (citing Booth & Brother v. Burgess, 72 N.J. Eq. 181, 190, 65 A. 226 (Ch. 1906)). She also noted: "That which one has a right to do cannot become a tort when it is done." Ibid.
In her discussion, Judge Morgan also analyzed Aalfo Co. v. Kinney, 105 N.J.L. 345, 144 A. 715 (E. & A. 1929). There, shareholders of Blake Mfg. Co. dissolved the company and sold its assets in order to thwart the performance of Blake's contract with plaintiff whereby plaintiff could purchase all of the whistles manufactured by Blake for a five-year period. The right of dissolution was a legal right, and the Court of Errors and Appeals held that the pursuit of such a right, no matter what may have been the motive of the promotor of the action, cannot be deemed either illegal or inequitable. Id. at 349, 144 A. 715. There, of course, the contract was not breached, but rather there was a failure of the expected performance by the dissolution of the obligor.
In Rothermel, the parties acknowledged the inapplicability of the Restatement exceptions to the general rule that parties are free to deal with whomever they wish. Plaintiff, therefore, had no right to demand that International Paper Co. continue to deal with him as a paper broker rather than to deal directly with plaintiff's customers. In Judge Morgan's words:
Fundamental to plaintiff's position is the view that his customers and supplier, by virtue of their prior course of dealing, were somehow in servitude to him for the *185 indefinite future or until he could make other arrangements in the paper trade to secure similar income. According to this theory, tort law required International to continue selling to him. We have found no law to support this novel contention.
....
Plaintiff's thesis here, that unfair dealing, in the absence of contract, with no ingredient of personal profit at defendant's expense, and with no malicious intent to injure, constitutes a sufficient basis for tort, is both unsound and unsupported.
There is not the slightest suggestion in the record that International ceased doing business with plaintiff out of malice....
[Rothermel v. International Paper Co., supra, 163 N.J. Super. at 247-248, 394 A.2d 860].
The case was viewed as one only seeking to vindicate plaintiff's "disappointed expectations." Id. at 248, 394 A.2d 860.
In the case before us, we have at least two distinguishing characteristics. First, plaintiff has alleged malice, although directed not at plaintiff itself, but at FSS, and, second, unlike the situations in Printing Mart and in Rothermel, defendants' actions are alleged to have been part of an attempt to lessen competition. We will look at each issue separately.
As much as we might decry defendants' alleged actions from a moral point of view, it appears that there is no New Jersey decision or settled body of law elsewhere which would support a cause of action solely for a malicious failure to deal commercially with another, whether the malice is directed at the other contracting party or a third party. Other results might well flow if the refusal to deal is based upon the other contracting party's refusal to violate a settled public policy of the State, such as the Law against Discrimination, N.J.S.A. 10:5-4, or a refusal to commit a criminal act.
Although there is no case we can find which is directly in point, an argument could be made that a similar public policy standard should apply to modify defendant's otherwise unbridled right to hire or retain a subcontractor as would restrict its ability to hire or discharge an employee at will. See D'Agostino v. Johnson & Johnson, Inc., 133 N.J. 516, 527-538, 628 A.2d 305 (1993); Woolley v. Hoffman-La Roche, Inc., 99 N.J. 284, 290-293, 491 A.2d 1257 (1985); Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 71-72, *186 417 A.2d 505 (1980). As of this time, in an "at-will" firing setting, the balance in New Jersey law has been struck in favor of a party's right to fire an employee subject only to a violation of "a clear mandate of public policy." See Pierce v. Ortho Pharmaceutical Corp., 84 N.J. at 72, 417 A.2d 505. Unfettered rights to refuse to deal with another have been expounded in other settings. See Levin v. Kuhn Loeb & Co., supra, (bank loans); Rothermel v. International Paper Co., supra, (continued use of an intermediary); Printing Mart-Morristown v. Sharp Electronics, supra, (bid rigging). None of these situations, however, involved a violation of a clear public policy mandate.[4]
While defendants' requirements that plaintiff breach its existing contracts with FSS and in the future submit higher bids than those given to defendant come close to the line, they also appear to steer clear of a violation of the criminal laws of this State.[5] The malice in this case and the attempt to induce a breach of existing contracts with a third party might be a basis to distinguish this case from those cited, even if an illegal effect on competition cannot be proven. The public policy of the State might at some point in the future be extended to protect against the inducement to breach an ongoing contract, but such a declaration is better left to the Supreme Court. See Coyle v. Englander's, 199 N.J. Super. 212, 219-220, 488 A.2d 1083 (App.Div. 1985).

III
We next explore the effect that plaintiff's allegations of an antitrust violation or defendants' alleged attempt to accomplish an *187 illegal effect on competition. The original complaint was insufficient to state a prima facie case for an antitrust violation, and plaintiff requested leave to amend. The elements plaintiff realized were missing in the initial complaint were added by the proposed amended complaint.
Rule 4:9-1 allows a party to amend a pleading if the adverse party gives written agreement or "by leave of court which shall be freely given in the interest of justice." "An amendment of a complaint should, of course, be allowed if the litigation has just commenced and the complaint would otherwise be subject to dismissal for failure to state a claim." Pressler, Current N.J. Rules, comment on R. 4:9-1 (citing Muniz v. United Hosps. Medical Ctr. Presbyterian Hosp., 153 N.J. Super. 79, 379 A.2d 57 (App.Div. 1977)). Leave to amend should be "freely given" without considering the merits of the amended complaint. City Check Cashing, Inc. v. National State Bank, 244 N.J. Super. 304, 308-309, (App.Div.), certif. denied, 122 N.J. 389, 585 A.2d 391 (1990). In this case the converse was true, the merits of the amended complaint were not looked at before the motion to amend was denied. The motion, therefore, should not have been summarily denied.
The relevant starting point is the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq. Plaintiff alleged in the proposed amended complaint that defendants violated the Act by attempting to monopolize the home building industry in a defined geographic locale.
a. It shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State.
[N.J.S.A. 56:9-4 a]
Private parties may recover for such a violation.
a. Any person who shall be injured in his business or property by reason of a violation of the provisions of this act may sue therefor and shall recover threefold the damages sustained by him, together with reasonable attorneys' fees and reasonable costs of suit....
[N.J.S.A. 56:9-12 a]
*188 There are few New Jersey cases interpreting the Act, and we must look to federal cases for guidance. This is expressly permitted by the Act.
This act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it.
[N.J.S.A. 56:9-18]
In Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of Am., 885 F.2d 683 (10th Cir.1989), cert. denied, 498 U.S. 972, 111 S.Ct. 441, 112 L.Ed.2d 424 (1990), a natural gas seller sued a buyer for failing to purchase gas. It was alleged that this was done in order to allow the seller's competitor to achieve a monopoly in violation of 15 U.S.C.A. § 2 (the comparable federal antitrust provision). Four elements need to be proven to establish a violation: (1) relevant geographic and product market, (2) high probability of success of monopolization, (3) specific intent, and (4) conduct to further an attempt to monopolize. Injury must also be shown. Id. at 693. The likelihood of achieving a monopoly is demonstrated through a market share sufficient for a monopoly to be created. Id. at 694. In that case a 41% market share was a good indication that a monopoly could be created if it could be proved that the company had the ability to attain that monopoly. Ibid.
In another case, a manufacturer stopped doing business with a regional distributor, and the business subsequently failed. The distributor claimed a violation of the Sherman Act. Spectrum Sports, Inc. v. McQuillan, 506 U.S. ___, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). The plaintiff had to prove that there was a high probability that the monopoly would be achieved. This requires a "definition of the relevant market and examination of market power." Id. at ___, 113 S.Ct. at 890, 122 L.Ed.2d at 256. The "ability to lessen or destroy competition in that market" must be examined. Id. at ___, 113 S.Ct. at 891, 122 L.Ed.2d at 257.
Here, defendants attempted but did not succeed in an anti-competitive act. Under federal antitrust law, however, attempt is more specifically defined. "`The phrase "attempt to monopolize" *189 means the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it.'" Knutson v. Daily Review, Inc., 548 F.2d 795, 813 (9th Cir.1976), cert. denied, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977) (quoting American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946)) (antitrust action for price fixing by independent distributors against newspaper publishers). In another federal case, attempt was said to include two elements: specific intent and a high probability of success. Dimmitt Agri Indus., Inc. v. CPC Int'l Inc., 679 F.2d 516, 525 (5th Cir.1982), cert. denied, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983) (antitrust suit brought by competitor manufacturer).
The required elements were clearly not shown in plaintiff's original complaint. The proposed amended complaint, however, does address the elements. The relevant geographic and product markets are defined as homebuilding in the Alpine and Cresskill area. The specific intent to create a monopoly is allegedly shown through the conduct of defendants to induce the breaches of contract and other unfair actions directed at its competitor.
What is unclear is whether there would be a high probability of success even if defendant had fifty percent of the market in that area. How could defendants destroy competition by having one subcontractor breach a contract or submit higher bids to a competitor? FSS might or might not have been able to replace plaintiff in its present contract, and it could have sought bids from other subcontractors for future contracts that might have been as advantageous for FSS as plaintiff's bids. There may also be other builders in the area besides FSS that compete with defendant and eliminating FSS from the area might still not mean a monopoly for defendant. Plaintiff would need at trial to demonstrate that there is a high degree of probability of success of monopolization by defendant. These, however, were factual issues, better resolved at trial.
*190 There is nevertheless a larger problem with plaintiff's antitrust cause of action. Plaintiff has no standing to sue in a private statutory antitrust suit. Even though the wording of the statute is quite broad, courts have narrowed the scope of persons permitted to sue in a private action. Midwest Communications v. Minnesota Twins, 779 F.2d 444, 450 n. 6 (8th Cir.1985), cert. denied, 476 U.S. 1163, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986) cited six factors necessary to assert an antitrust violation. Of those six, the relevant factor concerning standing is "(3) [w]hether the injury was of a type that Congress sought to redress with the antitrust laws...." (Quoting McDonald v. Johnson & Johnson, 722 F.2d 1370, 1374 (8th Cir.1983), cert. denied, 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984)). An antitrust plaintiff must be one within the "intended protection of the antitrust laws." Comet Mechanical Contractors, Inc. v. E.A. Cowen Constr., Inc., 609 F.2d 404, 406 (10th Cir.1980) (subcontractor had no standing to sue contractor for conspiring to rig bids). Additionally, the injured party must be the target of the anti-competitive activity. Lovett v. General Motors Corp., 975 F.2d 518, 520 (8th Cir.1992), rev'd in part on other grounds, 998 F.2d 575 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1058, 127 L.Ed.2d 378 (1994) (owner of automobile dealership had no standing to sue for damages).[6] Plaintiff, Van Natta, was not the target. The injury to plaintiff was thus incidental and not direct enough to permit standing for a direct state antitrust action. The fifth count of plaintiff's complaint seeking treble damages pursuant to N.J.S.A. 56:9-12 is not viable.
However, the grounds for the antitrust violation could nonetheless be used to prove defendants' unlawful, anti-competitive acts. And such conduct of defendants could still satisfy the *191 Restatement exception for acts that were a "means of accomplishing an illegal effect on competition." Restatement of Torts, § 762(b) (1939). Once the acts of defendants are so determined to be free of protection for a discretionary refusal to deal, plaintiff may demonstrate that these actions caused a direct injury. Then, based upon the past dealings of the parties and defendants' own expressed willingness to continue to deal, albeit conditioned on plaintiff's participation in the alleged antitrust violation, plaintiff could prove damages based on historical profits from its contracts with defendant. We conclude, therefore, that although plaintiff may not assert a statutory private treble damages claim for an antitrust violation, it may use the conduct to claim civil damages directly and proximately caused by defendants' alleged malicious and anti-competitive acts for a tortious refusal to deal with plaintiff.

IV
The same claim can be maintained against defendant Joseph Di Staulo, individually. A corporate officer can be held liable if that individual commits a tort or causes the corporation to commit the tort.
"A director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character, but a director or officer who commits the tort or who directs the tortious act to be done, or participates or cooperates therein, is liable to third persons injured thereby, even though liability may also attach to the corporation for tort."
[McGlynn v. Schultz, 95 N.J. Super. 412, 416, 231 A.2d 386 (App.Div. 1967), certif. denied, 50 N.J. 409, 235 A.2d 901 (1967) (quoting Sensale v. Applikon Dyeing & Printing Corp., 12 N.J. Super. 171, 175, 79 A.2d 316 (App.Div. 1951)).]
A corporate officer or principal is liable for tortious injury to another even if he was acting on behalf of a corporation and for its benefit. Van Dam Egg Co. v. Allendale Farms, Inc., 199 N.J. Super. 452, 457, 489 A.2d 1209 (App.Div. 1985). Plaintiff claims that Joseph Di Staulo directed his company to refuse to deal with it and if proved he would be personally liable for any subsequent injury. Since this claim of refusal to deal is akin to a tort, we *192 direct the claim against Joseph Di Staulo also be reinstated on remand.
The dismissal of the plaintiff's complaint is therefore reversed. Plaintiff should be given leave to amend its complaint to include allegations of unlawful anti-competitive acts by the defendants. The dismissal of the fifth count alleging statutory treble damages for a direct violation of the New Jersey Antitrust Act is affirmed. The claim against Joseph Di Staulo, individually, is directed to be reinstated on remand.
NOTES
[1] When the singular "defendant" is used in this opinion, it refers to the corporate defendant.
[2] We note that plaintiff's complaint here was dismissed with prejudice.
[3] This section would have appeared in the Restatement (Second) of Torts § 762 through 765 (1977), but the editors determined that it more properly belonged in the area of unfair competition which was to be covered in its own Restatement. The introduction to the Restatement (Second) of Torts, Division 9, (1977) states that "these topics are all within the general field of Trade Regulation rather than Torts, and ... the decision has therefore been made to delete them...." The Restatement of the Law Unfair Competition is now in draft form, approved at the May 19, 1993 meeting of The American Law Institute. Unfortunately, the subject of § 762 was also not included in this new Restatement. This leaves us, therefore, with the language of the 1939 Restatement which is recognized in New Jersey case law.
[4] As noted in D'Agostino v. Johnson & Johnson, Inc., 133 N.J. at 527, 628 A.2d 305: "Courts do not create their own public policy." ... We look to legislation, professional codes of ethics, court decisions, and the like. Pierce v. Ortho Pharmaceutical Corp., 84 N.J. at 72, 417 A.2d 505. In the absence of legislation, the courts "must define the cause of action in case-by-case determinations." Ibid.
[5] The closest criminal law apparently is the felony defined in the Sherman Act, 15 U.S.C.A. § 2. Federal law also defines the public policy of New Jersey. See D'Agostino v. Johnson & Johnson, Inc., 133 N.J. at 528, 628 A.2d 305.
[6] Standing has been expanded beyond the injured competitor. A buyer or seller in the affected market also would have standing. Comet Mechanical Contractors, Inc. v. E.A. Cowen Constr., Inc., 609 F.2d at 406. See New Jersey Chiropractic Soc'y v. Radiological Soc'y of New Jersey, 156 N.J. Super. 365, 371, 383 A.2d 1182 (Ch. Div. 1978) (holding that consumers had standing to sue in State antitrust cases when they "suffered injury to their `property.'")